UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

_____X

MEGAN TYRRELL,

                 Plaintiff,

    -against-

SEAFORD UNION FREE SCHOOL DISTRICT,
SEAFORD HIGH SCHOOL, MICHAEL J. RAGON,
PAULA SUSSMAN, GEORGE DUFFY, III, and
BRIAN CONBOY, all in their individual and official
capacity,

                 Defendants.

_____X

CV-08-4811 (SJF)(WDW)

**OPINION & ORDER**

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y

★   JUN 01 2011   ★

LONG ISLAND OFFICE

FEUERSTEIN, J.

      On November 28, 2008, plaintiff Megan Tyrrell ("plaintiff") commenced this action against

defendants Seaford Union Free School District ("Seaford UFSD"), Seaford High School and

Michael Ragon, Paula Sussman, George Duffy, III and Brian Conboy, all in their individual and

official capacity, (collectively, "defendants"),[1] pursuant to 42 U.S.C. § 1983 ("Section 1983") and

state law, alleging violations of her due process rights and New York Social Services Law §§ 413

and 420, negligence, failure to supervise, negligent infliction of emotional distress and battery. On

April 27, 2009, plaintiff filed an amended complaint against defendants pursuant to Section 1983,

Section 901(a) of Title IX of the Educational Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681,

*et seq.*, and state law, alleging, *inter alia*, violations of her due process rights, negligence, failure to

supervise, negligent infliction of emotional distress and battery. Defendants now move pursuant to

_____

   [1] By stipulation entered March 25, 2009, plaintiff voluntarily withdrew the complaint as
against two additional defendants, Massapequa School District and Massapequa High School.

Rule 56 of the Federal Rules of Civil Procedure for summary judgment dismissing the complaint. For the reasons stated herein, defendants' motion is granted.

I.    Background

A.    Factual Background[2]

1.    The Parties

Plaintiff is a twenty-one (21) year old female. (Transcript of the Examination Before Trial of Megan Tyrrell taken on June 14, 2010 ["Plf. Dep."], p. 7). Plaintiff attended Seaford High School from September 2003, when she entered the ninth grade, until April 2005, during her tenth grade year. (Plf. Dep., pp. 16-17; Transcript of the Examination Before Trial of Lisa Tyrrell taken on June 10, 2010 and June 11, 2010 ["Lisa Dep."], pp. 24-25). Prior to April 1, 2005, neither plaintiff nor her mother ever complained about security or supervision at the Seaford High School, and no employee of the Seaford UFSD ever told them that they would provide plaintiff with extra security or supervision while she attended Seaford High School. (Plf. Dep., pp. 33-34; Lisa Dep., pp. 49-51).

At all relevant times, defendant Michael Ragon ("Ragon") was the principal of Seaford High School, (Transcript of the Deposition of Michael Ragon ["Ragon Dep."], pp. 11-12); defendant Paula Sussman ("Sussman") was a social worker and drug and alcohol counselor at Seaford High School, (Transcript of the Deposition of Paula Sussman ["Sussman Dep."], pp. 11-12, 24); defendant George Duffy ("Duffy") was the superintendent of the Seaford UFSD,

---

[2] The factual allegations are derived from the parties' Rule 56.1 Statements and the affidavits and exhibits submitted in support of, and in opposition to, defendants' motion. The facts are not in dispute, unless otherwise indicated.

(Transcript of the Deposition of George L. Duffy ["Duffy Dep."], pp. 12-14); and defendant Brian

Conboy ("Conboy") was the assistant superintendent of schools "for curriculum, instruction and

personnel K through 12" for the Seaford UFSD, (Transcript of the Deposition of Brian Conboy

["Conboy Dep."], pp. 9-10). (Parties' Rule 56.1 Statements [56.1 Stat.], ¶¶ 2-5).


2.    The April 1, 2005 Incident

Plaintiff testified that on Friday, April 1, 2005, she left her home with her friend Corey at

approximately five o'clock (5:00) or six o'clock (6:00) in the evening. (Plf. Dep., pp. 82-83, 159).

They went to the home of their mutual friend, Albert Brady ("Albert"). (Plf. Dep., pp. 82-83, 159).

They spent approximately one (1) hour at Albert's house, where the three (3) friends drank one (1)

or two (2) cans of beer each. (Plf. Dep., pp. 76-77, 84-86). They then left to meet another of

plaintiff's friends, Justine Larracuto ("Justine"), who lived in Massapequa and attended

Massapequa High School, at the home of one of Justine's friends, Mike, in Seaford. (Plf. Dep., pp.

76-77, 84-86). At Mike's house, plaintiff drank a forty (40) ounce container of beer. (Plf. Dep.,

pp. 87-88). After approximately two (2) hours, they left Mike's home and went to "hang out" in

the parking lot of the Dunkin' Donuts in Seaford, which was a popular teen hangout. (Plf. Dep.,

pp. 88-89, 91). Plaintiff testified that she drank half (½) of another forty (40) ounce container of

beer in the parking lot of Dunkin' Donuts and felt drunk. (Plf. Dep., p. 89, 91, 107). According to

plaintiff, Justine also appeared to be drunk because she was "sloppy" and could not walk straight.

(Plf. Dep., p. 106-107). Another friend of plaintiff's, Matt Burnhauser ("Matt"), was also present

in the parking lot that night. (Plf. Dep., p. 124).

Plaintiff testified that she cannot "really remember a lot" of the time she spent in the

3

Dunkin' Donuts parking lot on the night of April 1, 2005, but remembers "getting into some kid's car and the lights going on and off and * * * the door opening;" "flashes of a camera;" and finding her underwear on the street in the parking lot. (Plf. Dep., p. 90, 91, 94-5). Plaintiff did not remember kissing Justine; taking her underwear or pants off; arguing with anyone; any males touching her inappropriately; Justine performing oral sex on her; or objecting to Justine's actions. (Plf. Dep., p. 96, 97, 99, 101, 119). Plaintiff did not know what time she left the parking lot or what time she got home that night, and she did not know who brought her home. (Plf. Dep., pp. 92-93, 102). Plaintiff's mother testified that plaintiff returned home that night before her curfew, sometime between 10:30 and 11:00 p.m.; appeared "fine" and not intoxicated; and did not tell her that anything went wrong that night. (Lisa Dep., pp. 157-158, 160-161).

Plaintiff testified that Justine told her the next day, Saturday, April 2, 2005, that they had "hooked up." (Plf. Dep., p. 98, 102-104, 106). According to plaintiff, she thought Justine meant that they had kissed, which she "didn't think * * * was a big deal," (Plf. Dep., 105), and "she had no idea what happened until [she] saw the pictures [of the incident]." (Plf. Dep., p. 104-105). Plaintiff denied ever asking anyone to take pictures of her and Justine on the night of the incident. (Plf. Dep., p. 174).

Tracie Ann Lombardo ("Tracie") was at the Dunkin' Donuts parking lot on the night of the incident. (Transcript of Deposition of Tracie Ann Lombardo ["Lombardo Dep."], pp. 18-19). According to Tracie, plaintiff already appeared intoxicated when she arrived at the parking lot and then plaintiff "chugged" the remainder of a forty (40) ounce beer in front of her. (Lombardo Dep., pp. 23, 56-57). Tracie testified that thereafter, while she was socializing with some other friends in the parking lot, she heard a rumor that there was a "three-way relationship" involving plaintiff,

4

Justine and a male, whom she did not know, occurring in the front seat of a pickup truck in the parking lot. (Lombardo Dep., pp. 24-26, 58, 61, 69). According to Tracie, she walked over to the truck, looked in the window and saw plaintiff laying down "allowing Justine to go down on her" and a male either standing right next to the open door on the driver's side of the truck where plaintiff's feet were or sitting in the front seat with plaintiff and Justine. (Lombardo Dep., pp. 24, 26-27, 30, 61, 71). Tracie did not see any physical contact between the male and plaintiff. (Lombardo Dep., pp. 69-71). Tracie testified that plaintiff was conscious and laughing during the incident, and she did not hear plaintiff object in any way during the incident. (Lombardo Dep., pp. 27-28, 61-62).

According to Tracie, she turned around because she was "grossed out," at which time she saw two (2) or three (3) males in the back of the truck taking pictures of the sexual encounter with their cameras through the back window of the truck. (Lombardo Dep., pp. 24-25, 28-29). Tracie then left because she was "disgusted with what was going on." (Lombardo Dep., p. 25).

### 3. The Pictures and Subsequent Harassment

Matt testified that on the morning of April 2, 2005, his friend Kevin Slavin ("Slavin") came to his home and told him that "something happened with [plaintiff] with pictures of her being nude and stuff going around and whatnot, and he had the pictures, whatever." (Transcript of Deposition of Matthew Burnhauser ["Burnhauser Dep."], pp. 27, 29). According to Matt, Slavin used his computer to access a photo-sharing website called "Photobucket.com" with a "link" to "John's car," showed him pictures of plaintiff displayed on that website and told him that "[plaintiff] got drunk and * * * diked out. She went lesbo." (Burnhauser Dep., pp. 27-29, 31, 61). Matt did not

know who took the pictures or put them on the website. (Burnhauser Dep., pp. 33, 66, 68; Plf. Dep., pp. 153-154). According to Matt, the pictures had been taken off of the website "pretty quick, like in a week or two." (Burnhauser Dep., p. 30).

Matt testified that he "probably" spoke with plaintiff that same date, i.e., April 2, 2005; that he told plaintiff that he had seen pictures of her on a website and what website they were on; and that plaintiff originally told him that she did not remember anything, but also told him that "guys raped her," she was embarrassed by the pictures of her and Justine and she wanted the pictures "down." (Burnhauser Dep., pp. 33-35, 37-39). According to Matt, plaintiff remembered "bits and pieces of things, but not the whole thing" and believed that "she had been ruffied [drugged] or something." (Burnhauser Dep., pp. 37-38, 66-67).

Contrary to Matt's testimony, plaintiff denied hearing anything about the April 1, 2005 incident until the evening of Tuesday, April 5, 2005, when Tracie called her and told her that there were pictures of her and Justine online which showed her "privates." (Plf. Dep., p. 96, 108-110). According to plaintiff, Tracie never indicated that she had actually seen the pictures online or how she had found out about the pictures. (Plf. Dep., p. 176). Plaintiff testified that she accessed the website about which Tracie had told her from her home computer and saw two (2) pictures of her taken during the April 1, 2005 incident displayed on the website. (Plf. Dep., pp. 96, 108-110, 112). Both pictures depicted Justine performing oral sex on plaintiff, (Plf. Dep., p. 98-99), but one was also a closeup of plaintiff's vagina. (Plf. Dep., p. 99). Plaintiff has not seen any other pictures taken during the April 1, 2005 incident. (Plf. Dep., p. 108). Plaintiff could not recall the address of the website on which she viewed the pictures, but testified that it was "one of those Web photoshot-dot-com or one of those websites where you put pictures up of you and your friends,"

6

and not a pornographic website. (Plf. Dep., p. 111). According to plaintiff, the website was "open" and not a private site, and did not require a password to access it. (Plf. Dep., p. 111).

Contrary to plaintiff's testimony, Tracie denied ever calling plaintiff and telling her about the pictures on the internet. (Lombardo Dep., p. 40). According to Tracie, about a week or two after the incident, plaintiff had told her that there were pictures of her on the internet and that she was upset that anyone would take pictures and post them on a website. (Lombardo Dep., pp. 34-35, 67, 73).

Plaintiff denied telling her parents or the police about the website on April 5, 2005. (Plf. Dep., p. 115). She also did not tell any employee of the Seaford UFSD about the website the following school day, Wednesday, April 6, 2005. (Plf. Dep., p. 116).

Plaintiff testified that when she spoke with Justine on Wednesday, April 6, 2005 or Thursday, April 7, 2005, Justine told her that the April 1, 2005 incident and pictures were not a problem for her because everyone knew that she was bisexual. (Plf. Dep., p. 116, 118). According to plaintiff, she knew prior to the April 1, 2005 incident that Justine was bisexual, but did not think Justine "would do anything to [her]." (Plf. Dep., p. 116). Plaintiff testified that Justine told her that she knew who put the pictures on the website, but refused to tell her. (Plf. Dep., pp. 117-118). However, plaintiff also testified that the individuals who took the pictures went to Massapequa High School and that she knew one of them had the last name "Rollo." (Plf. Dep., p. 154). She did not know Rollo prior to the incident, but claimed that Justine told her that he was present in the Dunkin' Donuts parking lot at the time of the incident. (Plf. Dep., p. 154).

Plaintiff testified that on Wednesday, April 6, 2005 or Thursday, April 7, 2005, she asked a student in her French class why everybody was giving her the cold shoulder and making fun of her,

and was told it was because of the pictures of the April 1, 2005 incident. (Plf. Dep., pp. 119-120). According to plaintiff, the students were being "more nasty to [her], making fun of [her], pointing at [her] in the hallways[,]" and calling her "a lesbian, carpet-muncher." (Plf. Dep., p. 120). About a week later, she also observed graffiti in a bathroom stall indicating: "Megan Tyrrell is a lesbian and has herpes." (Plf. Dep., p. 120, 122). According to plaintiff, when she asked one of her friends about the graffiti, her friend replied: "Well it's true, isn't it?" (Plf. Dep., p. 120). Plaintiff testified that the harassment continued throughout the two (2) weeks that she remained in Seaford High School following the April 1, 2005 incident. (Plf. Dep., p. 121).

### 4. Sussman's Interview with Plaintiff

On or about April 7, 2005[3], following a date rape seminar at Saint Anthony's School in Huntington ("Saint Anthony's), where Matt attended school, Matt told Mr. Hett, a social worker at Saint Anthony's, (Plf. Dep., p. 152; Burnhauser Dep., pp. 12, 33, 40), that he was concerned about plaintiff, (Lisa Dep., pp. 231-232; Sussman Dep., p. 47; Declaration of Marjorie Mesidor in Support of Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment [Mesidor Decl.], Ex. F), because she had been raped and there were pictures of her "getting eaten out by this girl" on the internet, (Burnhauser Dep., pp. 40-41). Mr. Hett then called Sussman and told her about the pictures, (Lisa Dep., p. 232; Duffy Dep., p. 48; Mesidor Decl., Ex. F), and that plaintiff had told Matt that she had gotten drunk, passed out and had been sexually

---

[3] Although Matt testified that he spoke with Mr. Hett between April 3, 2005 and April 5, 2005, he could not have spoken with Mr. Hett on April 3, 2005 because it was a Sunday, not a school day. Moreover, Matt further testified that he spoke with Mr. Hett on the Thursday or Friday of the week following the April 1, 2005 incident, (Burnhauser Dep., p. 40), which would have been April 7th or 8th, 2005.

assaulted by several young men over the weekend, (Sussman Dep., pp. 46-48; Mesidor Decl., Ex. F). Thereafter, Sussman reported to Ragon that plaintiff had been "sexually violated" over the weekend, that pictures had been taken of the incident and that she was going to interview plaintiff. (Sussman Dep., p. 49; Ragon Dep., pp. 37-38; Conboy Dep., p. 116; Mesidor Decl., Ex. F). Ragon agreed that Sussman should talk to plaintiff and told her to keep him informed. (Sussman Dep., pp. 49-50; Ragon Dep., p. 39; Conboy Dep., pp. 44, 53-54, 116).

On April 7, 2005, the same day that she learned of the April 1, 2005 incident and pictures, Sussman called plaintiff into her office to interview her about the incident. (56.1 Stat., ¶¶ 12; Plf. Dep., p. 121; Lisa Dep., p. 232; Sussman Dep., pp. 46, 49-52; Mesidor Decl., Ex. F). Sussman observed that on the way to her office, plaintiff's demeanor was "upbeat." (Mesidor Decl., Ex. F). According to Sussman, she told plaintiff that she had received a disturbing telephone call that she hoped plaintiff could clarify for her, then she asked plaintiff what had happened to her over the weekend. (Sussman Dep., pp. 52-53; Mesidor Decl., Ex. F). Sussman testified that plaintiff told her that she had been drinking in the Dunkin' Donuts parking lot and had gotten drunk; that she had gotten into the backseat of a car with her best friend, where they proceeded to have "oral and manual sex;" and that pictures had been taken of her engaging in sexual activity with her best friend and were displayed on a website. (Sussman Dep., pp. 53, 55-56, 62, 63; Mesidor Decl., Ex. F). According to Sussman, plaintiff did not know how to get to the website on which the pictures were displayed, but identified one (1) student of Seaford High School, Gerald Travato ("Travato"), whom she believed had information regarding the website. (56.1 Stat., ¶¶ 19; Sussman Dep., pp. 54-56, 59-60). Plaintiff never told Sussman that she could not remember the incident, that she had blacked out during the incident or that she had awakened to find her underwear on the floor.

9

(Sussman Dep., p. 62).

Plaintiff testified that she did not remember going into detail about the April 1, 2005 incident or pictures with Sussman, (Plf. Dep., p. 123, 124), and she did not view the pictures on the internet with Sussman, (Plf. Dep., p. 127). According to plaintiff, she told Sussman what the two (2) pictures she had previously observed depicted; that she had been drinking; and that she could only remember "the lights going on and off, flashing lights, a door opening, [and] finding [her] underwear on the floor." (Plf. Dep., p. 126). Plaintiff testified that Sussman told her that there had been a similar situation before where someone took pictures of a girl and her boyfriend and "it's not that big of a deal" and was "nothing to get all worked up about." (Plf. Dep., p. 123, 125-126). Plaintiff further testified that she only spoke with Sussman on that one occasion and that they had spoken for only ten (10) to twenty (20) minutes. (Plf. Dep., pp. 123-124, 127, 155).

Contrary to plaintiff's testimony, Sussman denied discussing a similar situation with plaintiff or telling plaintiff that her situation was "not that big of a deal." (Sussman Dep., pp. 56-57). According to Sussman, she told plaintiff that she was available to her if she needed her for anything and that her door was always open. (Sussman Dep., pp. 56-57). Sussman further testified that when she asked plaintiff if she was all right, plaintiff responded "yes," but told her that "a few students" had made "some snide remarks" about her being a lesbian that morning. (Sussman Dep., pp. 54, 55, 101-102; Mesidor Decl., Ex. F). Plaintiff did not identify the students who made the remarks to Sussman. (Sussman Dep., pp. 55-56). According to Sussman, plaintiff appeared "[m]ore angry than upset" that students had called her a lesbian earlier in the day; had appeared "fine" during their conversation, i.e., she was not crying, screaming or extremely emotional; was "very matter of fact in talking to [her];" and did not appear uncomfortable or embarrassed.

10

(Sussman Dep., pp. 142-143, 145-147, 152; Mesidor Decl., Ex. F). Ragon testified that Sussman had relayed to him that plaintiff had not expressed "the level of concern that someone would have experienc[ed] – going through the act * * * and didn't express any level of depression * * *." (Ragon Dep., pp. 115-116).

Sussman testified that she told plaintiff that she wanted to call her parents, (Lisa Dep., p. 182; Sussman Dep., p. 99), but plaintiff told her that she did not want her parents to know about the incident or pictures. (Plf. Dep., p. 130; Sussman Dep., pp. 54, 99). Plaintiff did not ask Sussman to contact the police and testified that she did not, in fact, want the police contacted. (Plf. Dep., p. 132). Plaintiff could not remember if she asked Sussman to try to do anything with respect to the pictures on the website. (Plf. Dep., pp. 132-133).

Contrary to plaintiff's testimony, Sussman testified that she called plaintiff to her office again the following day to see how she was doing and to tell her that she "knew for a fact that the website was down * * *." (Sussman Dep., pp. 97-98; Mesidor Decl., Ex. F). According to Sussman, plaintiff appeared relieved and seemed "fine." (Sussman Dep., p. 98, 99; Mesidor Decl., Ex. F). Sussman never told plaintiff that she had seen the pictures. (Sussman Dep., p. 98).

According to Matt, plaintiff had initially been angry with him for telling Mr. Hett about the incident and pictures because she "didn't want anyone knowing" and she had been called down to Sussman's office as a result. (Burnhauser Dep., pp. 39, 43-44). However, a couple of days later, plaintiff called Matt and thanked him. (Burnhauser Dep., p. 39, 44, 45).

Prior to meeting with Sussman on April 7, 2005, plaintiff had not told any adult at Seaford High School about the April 1, 2005 incident or the pictures. (Plf. Dep., pp. 121-122). Although plaintiff testified that some students were already making fun of her and calling her names in the

11

hallways and classrooms at school, she did not tell any adult at Seaford UFSD about the harassment. (Plf. Dep., p. 128-129, 156). Plaintiff testified that she did tell someone about the bathroom graffiti, but she could not remember whom. (Plf. Dep., pp. 156-157). Moreover, plaintiff did not ask anybody at the Seaford UFSD to remove the bathroom graffiti. (Plf. Dep., p. 157).

Plaintiff testified that after she spoke with Sussman, the harassment at school got worse and was most severe through June 2005. (Plf. Dep., pp. 155-156, 159-161). According to plaintiff, people would scream and curse at her; call her names in the hallways; tell her to leave school; and push her. (Plf. Dep., pp. 159-160). Even though she did not attend Seaford High School after April 19, 2005, plaintiff claimed that the harassment continued "any time anyone would see [plaintiff] at a party or something * * *" and "any time [she] would see anybody, whether [she] was at the library being home-schooled, walking home from the library, hanging out with [her] friends and seeing other people from school." (Plf. Dep., p. 161, 186-187). Plaintiff did not know if the people harassing her had actually seen the pictures or if they had just heard about the April 1, 2005 incident. (Plf. Dep., p. 187).

Plaintiff did not tell any adult at Seaford High School of the harassment, provide them with the names of any of the students harassing her or communicate in any way with Ragon, Conboy or Duffy about the incident. (Plf. Dep., pp. 160, 175-176, 192-193, 222-223). Although plaintiff claimed that she "noticed that some of the teachers were getting a little concerned * * * [and] always asked [her] if [she] needed somebody to talk to or if [she] was upset [she] could always go and turn to them," (Plf. Dep., p. 223), she did not talk to any teacher about the incident or harassment because she did not want to talk to anybody about what happened, "especially not a

teacher if they already knew about it." (Plf. Dep., p. 224).

5.     Defendants' Investigation

On April 7, 2005, following her first discussion with plaintiff, Sussman reported to Ragon

that plaintiff had told her that she had been drinking and had engaged in consensual behavior with

her best friend, of which pictures had been taken; and that plaintiff had identified Travato as a

Seaford UFSD student who could provide them with the address of the website on which the

pictures were displayed. (Sussman Dep., pp. 59-62; Ragon Dep., p. 43; Mesidor Decl., Ex. F).

Thereafter, Sussman and Ragon spoke with Travato, who provided them with the name of his

cousin, a student at Massapequa High School, as someone with knowledge of the address of the

website on which the pictures were displayed. (56.1 Stat., ¶¶ 20; Sussman Dep., pp. 61, 67-71;

Ragon Dep., pp. 44-45; Duffy Dep., pp. 46-47).

On April 7, 2005, following her interview with Travato, Sussman contacted George Taibi

("Taibi"), a social worker at Massapequa High School, (Lisa Dep., p. 232; Sussman Dep., pp. 72-

73; Mesidor Decl., Ex. F), and requested assistance in shutting down the website on which the

pictures of the April 1, 2005 incident were displayed. (56.1 Stat., ¶¶ 22). Within one (1) hour

thereafter, Taibi called Sussman back and advised her that the principal of Massapequa High

School had obtained the website address and would have the student involved with it shut it down

and remove the pictures. (56.1 Stat., ¶¶ 22; Sussman Dep., pp. 74-76). After Sussman was

provided with the address of the website on which the pictures of the April 1, 2005 incident were

displayed, she accessed the website, which she described as a "photo gallery personal website,"

from her office computer and viewed two (2) or three (3) pictures of plaintiff and "another young

lady" performing sexual acts. (56.1 Stat., ¶¶ 23; Sussman Dep., pp. 76-81, 94; Conboy Dep., p. 92). After viewing the pictures, Sussman reported to Ragon that the pictures existed on the internet and that she was waiting to hear back from Massapequa. (Sussman Dep., p. 82; Ragon Dep., pp. 47-51). Ragon never indicated to Sussman that the matter should be reported to plaintiff's parents, the police or the Department of Social Services. (Sussman Dep., pp. 82-84). According to Ragon, he never reported the matter to any governmental agency because he "did not believe it fell under the criteria to report it to an agency." (Ragon Dep., p. 108).

Sussman accessed the website from Ragon's office later that same day, April 7, 2005, and ascertained that the pictures of the April 1, 2005 incident had been removed from the site. (56.1 Stat., ¶¶ 24; Sussman Dep., pp. 79-80, 153). Sussman did not know of anyone besides herself accessing the pictures from a Seaford UFSD computer or of any other person from the Seaford UFSD administration ever seeing the pictures. (Sussman Dep., p. 94). Ragon testified that he never saw the pictures and was never provided with any information giving him the impression that they "were of a pornographic form." (Ragon Dep., pp. 107-108). Conboy was never made aware of the identity of any individual who allegedly saw the pictures displayed as "wallpaper" on the Seaford UFSD's computers. (Conboy Dep., p. 97).

According to plaintiff's mother, a detective told her that the pictures of the April 1, 2005 incident had been displayed "as wallpaper" on the computers in the Seaford High School computer room and Matt's mother told her that Matt's friend said that he had seen the pictures on Seaford UFSD computers. (Lisa Dep., pp. 205-207, 252-254). Although Matt never saw the pictures of the April 1, 2005 incident on any Seaford UFSD computer, he claimed that "a lot of [his] friends * * * said it was like the background of * * * the computers in the computer lab room." (Burnhauser

14

Dep., pp. 45-46). According to Matt, plaintiff, Slavin and some other friends told him that Travato put the pictures "in the background [on computers] of Seaford High School * * *" and that the pictures were set as "background" on the computers in the Seaford High School computer labs "[a]t least for a couple of days." (Burnhauser Dep., pp. 50-51, 63-64). However, Matt also testified that he did not know who set the pictures as "background" on the Seaford UFSD computers or if any teachers knew about it. (Burnhauser Dep., pp. 64-65).

Plaintiff also never saw the pictures of the April 1, 2005 incident on a Seaford UFSD computer, (Plf. Dep., p. 134), or told anyone at the Seaford UFSD that the pictures were being displayed on the Seaford UFSD computers, (Plf. Dep., p. 135, 186). Plaintiff did not tell her mother that she ever saw the pictures displayed on a Seaford UFSD computer. (Lisa. Dep., p. 204). According to plaintiff, following her discussion with Sussman on April 7, 2005, Tracie and another student, Robert Gemski ("Gemski"), told her that the pictures of the April 1, 2005 incident were being displayed on the computers in the Seaford High School computer room. (Plf. Dep., pp. 134-135, 186; Plf. Interr. Resp. No. 10(c)). However, Gemski testified that although he had heard of the existence of "inappropriate" pictures of plaintiff engaging in oral sex with another female, he never saw any such pictures, heard of the pictures being shown in Seaford High School or told plaintiff, Tracie or anyone else that he had seen the pictures displayed as "wallpaper" on the Seaford UFSD's computers. (Transcript of Deposition of Robert Gemski ["Gemski Dep."], pp. 9, 15, 21-22, 24, 27, 63). Likewise, Tracie testified that although she saw a couple of the pictures of the April 1, 2005 incident, she did not see them at Seaford High School, (Lombardo Dep., pp. 32, 55), and she never learned that they had been displayed on the Seaford UFSD's computers, that they were being distributed or that any student had ever accessed the pictures from a Seaford High

15

School computer. (Lombardo Dep., pp. 38-39, 55).

Ragon informed both Conboy and Duffy of the April 1, 2005 incident and pictures. (Ragon Dep., pp. 53-54, 57-58; Conboy Dep., pp. 39-40, 42; Duffy Dep., pp. 29-31, 36). According to Conboy, based upon a conversation he had with Ragon following Sussman's interview with plaintiff, wherein Ragon had informed him that plaintiff had been "forthcoming in speaking to [Sussman] and comfortable in speaking to [Sussman] and returned to school after [her] conversation [with Sussman]," he believed that "the situation was being handled appropriately." (Conboy Dep., pp. 56-57, 60).

Conboy did not discuss the matter with Duffy until plaintiff's mother requested home-schooling for plaintiff a few weeks later, (Conboy Dep., p. 47), and never notified plaintiff's parents of what he had learned about the incident. (Conboy Dep., p. 54). Conboy testified that at Duffy's direction, the Seaford UFSD investigated an allegation that a student had accessed one of the pictures of the April 1, 2005 incident from, and displayed it as "wallpaper" on, a computer in one of Seaford High School's computer labs, but was never able to substantiate that allegation. (Conboy Dep., pp. 93-95, 99). Specifically, Ragon contacted Mark Derison ("Derison"), the director of technology for the Seaford UFSD during the 2004/2005 and 2005/2006 academic years; provided him with a website address; and requested that he ascertain if anybody had viewed "inappropriate" pictures and/or video of a Seaford UFSD student on that website from a Seaford UFSD computer and, if so, whether that website could be blocked or removed from the Seaford UFSD computers. (Transcript of Deposition Testimony of Mark Derison ["Derison Dep."], pp. 12-13, 79-82). Derison's subsequent search of the Bascom security system used by the Seaford UFSD revealed that the website had been accessed only once from one (1) computer, that being

Sussman's computer. (Derison Dep., pp. 82-83; Conboy Dep., pp. 94-96, 99; Duffy Dep., pp. 21-24). Derison then blocked access to the website from all Seaford UFSD computers and reported his information to Ragon. (Derison Dep., pp. 83, 85).

According to Derison, the Bascom security system would not have revealed whether any pictures had been displayed as "wallpaper" on a particular computer. (Derison Dep., p. 88). According to Conboy, the Seaford UFSD's computers and servers were not searched to ascertain whether the pictures of the April 1, 2005 incident had ever been uploaded from a source other than a website. (Conboy Dep., p. 96). However, Derison did not believe any of the software used by the Seaford UFSD at all relevant times would have indicated if the pictures had been displayed as "wallpaper" on a Seaford UFSD computer. (Derison Dep., p. 92).

### 6. Plaintiff's Mother's Involvement

Plaintiff's mother testified that she first learned of the April 1, 2005 incident and pictures on or about April 15, 2005, when her sister, Sally, informed her that there were "compromising" pictures of plaintiff "going around in Seaford [UFSD]" and "all over Seaford." (Lisa Dep., pp. 149-150, 162-170, 174, 236). Sally did not see the pictures and was not an employee of the Seaford UFSD, and plaintiff's mother did not know from where Sally gained the information she transmitted to plaintiff's mother. (Lisa Dep., pp. 165, 168, 261).

Plaintiff testified that she did not tell her parents about the incident or pictures and that one afternoon her mother just asked her if there were pictures of her displayed on the internet. (Plf. Dep., p. 161). According to plaintiff, upon being confronted by her mother, she started crying and went to her room because she did not want to discuss the situation with her mother. (Plf. Dep., pp.

161-162). Plaintiff testified that she did not discuss the incident and pictures with her mother until they went to see Pat Mosounic ("Mosounic"), the psychologist with whom plaintiff had been treating since she was fourteen (14) years old. (Plf. Dep., pp. 29, 34, 162; Lisa Dep., pp. 24-29, 54-55). During their session with Mosounic, plaintiff told her mother that she had "ended up drinking" and did not "really remember most of th[e] night, but the pictures explained what happened." (Plf. Dep., p. 162). Plaintiff's mother never saw the pictures of the April 1, 2005 incident or tried to access the website on which the pictures were displayed. (Plf. Dep., p. 162; Lisa Dep., p. 183, 227-228, 255).

Plaintiff's mother testified that when she first spoke with plaintiff about the April 1, 2005 incident, plaintiff denied having been under the influence of anything at the time of the incident and told her that she had been "hanging out with her friend, and that all she remembered was her underwear around her ankles;" that she did not remember the incident or the pictures being taken; and that she had found out about the pictures from someone from school. (Lisa Dep., pp. 175-177, 185-186, 199, 250, 310). Plaintiff's mother testified that she believed that plaintiff's inability to remember anything about the April 1, 2005 incident was because "somebody had slipped [her] something." (Lisa Dep., pp. 177-179).

Plaintiff's mother further testified that plaintiff told her that pictures of Justine "simulating a sexual act" on her "were posted on the web and that * * * she endured a lot of harassment at school, that kids were calling her lesbian, that everybody was pointing to [her], and saying 'That was the girl.' * * * [and] [t]here was stuff written on the bathroom wall, that [she] was a lesbian." (Lisa Dep., pp. 192, 250). Plaintiff also told her mother "that the whole school knew about it." (Lisa Dep., p. 193). According to plaintiff's mother, the pictures had been posted on "a public

web, from somebody from Massapequa" named "Mike," (Lisa Dep., p. 194), and Mike's cousin "went to Seaford [UFSD], and injected the pictures into Seaford [UFSD's] computer." (Lisa Dep., p. 196). Plaintiff did not tell her mother about the alleged harassment of her at school prior to April 15, 2005, (Lisa Dep., p. 236), but did tell her that she had spoken with Sussman about the April 1, 2005 incident and pictures and that Sussman had seen the pictures. (Lisa Dep., p. 167, 170-171, 180-181, 188, 198, 322).

On Friday, April 15, 2005, two (2) weeks after the incident, plaintiff's mother went to Seaford High School to speak with Sussman. (Lisa Dep., p. 167, 170-171, 180-181, 188, 198, 322; Duffy Dep., p. 93). According to plaintiff's mother, because the secretary at Seaford High School told her that Sussman was not there, she spoke with the assistant principal to ascertain whether he "knew of any pictures" and made an appointment to speak with Sussman the following Monday, April 18, 2005. (Lisa Dep., p. 167, 170-171, 180-181, 188, 198, 322; Duffy Dep., p. 93).

On Monday, April 18, 2005, Sussman met with plaintiff's mother, but told her that she would not discuss the matter without a signed release form from plaintiff because of confidentiality concerns, (Plf. Dep., p. 164; Lisa Dep., p. 213, 215-219, 322-323; Sussman Dep., p. 108, 113, 116; Duffy Dep., pp. 93-94; Mesidor Decl., Ex. F); that the pictures had been taken off the website; and that she should discuss the matter with plaintiff. (Sussman Dep., pp. 117-118). According to Sussman, as a social worker for the Seaford UFSD, she followed a policy and procedure regarding student confidentiality set by the New York State Office of Mental Health and Alcohol Abuse, which paid part of her salary, providing that such confidentiality could only be broken: (1) if she was aware of (a) child abuse, which she defined as "[t]he use of force, physical force, against a child," (b) neglect, which she defined as "[n]ot providing the child with adequate things that they

19

would need for their ability to thrive" or (c) sexual abuse, which she defined as "any kind of sexual intercourse or forced sexual acts by an adult to a minor" or a "forced situation" between minors; or (2) if someone indicated that they were going to harm themselves or someone else. (Sussman Dep., pp. 34-36, 38-43, 119). Plaintiff's mother never complained to anyone at the Seaford UFSD about her conversation with Sussman. (Lisa Dep., p. 226).

According to an e-mail dated May 2, 2005, sent by Ragon to Duffy upon Duffy's request for a timeline of the situation, (Ragon Dep., pp. 58-63; Duffy Dep., pp. 45-46, 68), Ragon had contacted Duffy on April 18, 2005 to inform him of Sussman's meeting with plaintiff's mother, at which time Duffy told Ragon that he believed plaintiff's mother should be informed "as the incident may present a danger to the health and safety of [plaintiff]." (Mesidor Decl., Ex. D). According to Duffy, Ragon contacted him for guidance on how to proceed because he was concerned that Sussman believed that her conversation with plaintiff was confidential and that plaintiff did not want the information shared with her parents. (Duffy Dep., pp. 31, 38-39, 46, 49, 90-91). Duffy testified that it was his understanding following his conversation with Ragon that plaintiff "like any other teenage girl at that age wouldn't want their parents to be aware of what activity they've been involved in, but was okay with [the April 1, 2005 incident], was not upset by it, that it was a consensual behavior between she and [that] other young lady and that she was fine. She really didn't want any other involvement in it * * *." (Duffy Dep., pp. 49, 59).

Following his conversation with Duffy, Ragon contacted the Seaford UFSD's counsel, who, according to Ragon's May 2, 2005 e-mail, returned his call two (2) days later, i.e., on or about April 20, 2005. (Mesidor Decl., Ex. D). After speaking with counsel, Ragon contacted plaintiff's mother to schedule a meeting with her, (Mesidor Decl., Ex. D), to inform her "of the

nature of what had taken place and that there had been pictures on the internet and that [the Seaford UFSD's] understanding was that at th[at] time [the pictures] had been removed from the internet." (Duffy Dep., pp. 31, 32, 96). According to Ragon's e-mail, he met with plaintiff's mother on April 22, 2005, the same date that she returned his call, (Mesidor Decl., Ex. D), although plaintiff's mother testified that Ragon contacted her on or about April 19, 2005, (Lisa Dep., p. 226). According to plaintiff's mother, Ragon told her that the Seaford UFSD had consulted with its lawyers and was ready to talk to her; that he had found out about the pictures of the April 1, 2005 incident; and that everything had been "taken off the computer" as of April 11th or 12th, 2005. (Lisa Dep., pp. 226-227). Plaintiff's mother further testified that Ragon identified Travato, who attended Seaford High School, and Travato's cousin Mike and Justine, both of whom attended Massapequa High School, as the individuals involved in the April 1, 2005 incident and told her that Mike "had pictures on a website," but "that any other pictures on the computer were taken off." (Lisa Dep., pp. 242-243, 265-266). Ragon did not specify to which computers he was referring and never said that students at Seaford High School had posted or had been looking at the pictures on Seaford UFSD computers. (Lisa Dep., pp. 243-245, 266). Plaintiff's mother did not believe that anyone employed by the Seaford UFSD had displayed the pictures on the Seaford UFSD computers, only that they, and specifically Sussman, had seen them. (Lisa Dep., pp. 247-249). According to plaintiff's mother, she did not know anything about the pictures being on the Seaford UFSD's computers until she spoke with Ragon "and he filled [her] in on who was involved * * * named all the names, and [provided her with] the full story * * *." (Lisa Dep., p. 228, 231, 234). Plaintiff's mother further testified that Ragon also mentioned the name "John Rollo" as someone "involved in the incident, somehow." (Lisa Dep., p. 271).

21

Plaintiff's mother testified that following her conversation with Ragon, she called Saint Anthony's and asked Mr. Hett and a Mrs. Walsh when they had learned of the April 1, 2005 incident and pictures. (Lisa Dep., pp. 235-237). According to plaintiff's mother, they told her that they had learned about the incident and pictures on April 6, 2005, following a rape seminar, and that they had contacted Sussman on that date. (Lisa Dep., p. 237).

Over plaintiff's objection, plaintiff's mother reported the April 1, 2005 incident and the existence of the pictures to the Nassau County Police Department ("NCPD") following her discussion with Ragon. (56.1 Stat., ¶¶ 33; Lisa Dep., p. 241-242, 246; Plf. Dep., pp. 168-169). According to plaintiff, she was interviewed by a female detective whom she told that she did not remember most of the April 1, 2005 incident because she had been drinking and "was blacking in and out" or unconscious, but that pictures of her with another girl had been displayed on the computer a couple of days after the incident. (Plf. Dep., pp. 166-167). Plaintiff's mother did not object to the NCPD closing its investigation, or request that anyone be arrested, after detectives from the NCPD retrieved the pictures and a video taken during the April 1, 2005 incident and showed the video to her. (56.1 Stat., ¶¶ 34-35; Lisa Dep., pp. 184, 258-259). According to plaintiff's mother, the video depicted Justine running over to plaintiff, who was awake and fully dressed, yelling "They want us to do it. They want us to do it again," and kissing plaintiff on the lips. (Lisa Dep., pp. 256-257).

At her mother's request, plaintiff did not return to Seaford High School after April 19, 2005. (56.1 Stat., ¶¶ 26; Lisa Dep., pp. 240, 349, 361; Ragon Dep., p. 76, 81). Before she left Seaford High School, plaintiff never observed any pictures of her on any of the computers at the school. (56.1 Stat., ¶¶ 27).

22

By letter to Ragon, dated April 26, 2005, plaintiff's mother requested that plaintiff be home-schooled for the remainder of the 2004-2005 academic year. (Mesidor Decl., Ex. C). Although Conboy was usually the administrator who approved home-schooling for students in the Seaford UFSD, (Conboy Dep., pp. 15-16; Duffy Dep., pp. 55-56), Duffy actually made the decision to approve home-schooling for plaintiff, informed Conboy of his decision and directed Conboy to follow up with plaintiff's mother. (Conboy Dep., pp. 21-26, 112; Duffy Dep., pp. 56-58). According to Duffy, he approved home-schooling for plaintiff based upon documentation from Mosounic indicating that plaintiff had stopped attending school and required home instruction. (Duffy Dep., pp. 63-64). Plaintiff was home-schooled throughout the remainder of her sophomore year and during her entire junior year. (Plf. Dep., pp. 18-19; Lisa Dep., pp. 241, 350, 352-353).

Plaintiff's mother testified that she filed a notice of claim on behalf of herself and plaintiff with the Seaford UFSD. (Lisa Dep., p 56). A facsimile cover sheet from plaintiff's mother to Wendy Pelle-Beer dated June 17, 2005 [sic] indicates that plaintiff's mother delivered the notice of claim on June 27, 2005. (Reply Affidavit of Francis X. Schroeder [Schroeder Reply], Ex. 1). However, the notice of claim was not notarized until June 28, 2005. (Schroeder Reply, Ex. 1). A notice of claim dated June 27, 2005 was marked as being received in Duffy's office on June 28, 2005. (Duffy Dep., pp. 72-73).

### 7.    Seaford UFSD's Internet Access Policy

Derison testified that the Seaford UFSD, as a recipient of federal "E-Rate funds," was required "to provide a secure educational environment for students online" in compliance with the

Children's Internet Protection Act ("CIPA"). (Derison Dep., p. 18). According to Derison, "[t]he easiest way to comply with CIPA was to install filtering hardware and/or software," so that was what the Seaford UFSD did. (Derison Dep., p. 19). The filtering hardware and/or software was installed on Seaford UFSD computers sometime before the 2004/2005 academic year, although noone knew the precise date of installation. (Derison Dep., pp. 20-21; Ragon Dep., p. 17; Conboy Dep., pp. 71-72; Duffy Dep., p. 17). According to Derison, the E-Rate program required the Seaford UFSD to submit paperwork every three (3) years from when it accepted or applied for E-Rate funding. (Derison Dep., pp. 25-26). According to Conboy, Seaford UFSD's filtering program is evaluated every two (2) years, as part of the Seaford UFSD's state-mandated technology plan. (Conboy Dep., pp. 73-74). The Seaford UFSD was never cited by the E-Rate program for a failure to comply with CIPA. (Derison Dep., p. 27).

During the 2004/2005 academic year, Seaford UFSD's filtering program used a combination of software and hardware from a company called Bascom. (Derison Dep., pp. 21-22). According to Derison, the Seaford UFSD used the latest version of the program, so that whenever it was updated, Seaford UFSD's program was updated. (Derison Dep., pp. 21, 23-24). The filtering program excluded access to particular websites based upon address or category, (Ragon Dep., pp. 23-25; Derison Dep., pp. 29, 73-74), and also, according to Ragon, to content based upon certain words or phrases connected to "inappropriate material." (Ragon Dep., pp. 23-25). Although a website with content blocked by category could be accessible if "there was * * * a logical reason for which Bascom allowed it to pass," websites "specifically blocked by address * * * could not be accessed." (Derison Dep., pp. 73-74). A list of prohibited websites was loaded into the system and automatically updated each night by Bascom, and Derison could add any other

24

website at any time. (Derison Dep., pp. 30-31). According to Derison, the Seaford UFSD "tended to be more restrictive [about the websites accessible on its computers] than the default" set by Bascom, (Derison Dep., p. 32), and students, parents and teachers "generally complained [that the filtering system] was too restrictive." (Derison Dep., pp. 38-39). Derison referred the complainants to the Seaford UFSD's policy on internet use and to CIPA. (Derison Dep., p. 39). Students' access to the internet was more restrictive under the filtering program than the access provided to administrators and teachers of the Seaford UFSD. (Ragon Dep., p. 19; Derison Dep., pp. 41-44).

The Seaford UFSD also had its own policies and procedures regarding use of the internet on its computers. (Derison Dep., pp. 27-28). Pursuant to the Seaford UFSD's internet-use policy, only websites "deemed educationally appropriate" could be viewed on its computers. (Derison Dep., pp. 28, 32-33, 59; Ragon Dep., p. 25; Duffy Dep., p. 77). Child pornography was not permitted to be viewed on Seaford UFSD computers, (Ragon Dep., p. 107; Conboy Dep., pp. 101-102), and sites "of a sexual nature" were also prohibited. (Derison Dep., pp. 72-74). Staff members of the Seaford UFSD monitored students' access to Seaford High School computers. (Ragon Dep., pp. 25-26; Conboy Dep., pp. 79-82; Duffy Dep., p. 20; Derison Dep., p. 29). In addition, students of Seaford High School and their parents were required to read and sign the Seaford UFSD's internet-use policy annually before they would be issued a user name and password allowing them access to a Seaford UFSD computer. (Derison Dep., pp. 29-30, 60-61). The Seaford UFSD's policy did not permit a student access to its computers otherwise. (Derison Dep., pp. 61-63). In addition, students were "locked out of manipulating most settings on the [Seaford UFSD's] computers," including, *inter alia*, the ability to change the desktop background

or "wallpaper." (Derison Dep., p. 65).

In 2005, computers were only accessible to students at Seaford High School in the library and computer labs., (Ragon Dep., pp. 26-27; Conboy Dep., p. 78), and there were approximately twelve (12) computers in the library and twenty (20) to thirty (30) computers in each of the computer labs. (Ragon Dep., p. 27; Conboy Dep., pp. 79, 88; Derison, pp. 54-55). In order to use the computers in the library, students were required to sign up for a computer and leave their student identification in an envelope on the computer. (Conboy Dep., p. 79).

Conboy testified that in the spring of 2005, students were permitted to download materials appropriate for use in school projects to the Seaford UFSD's computers. (Conboy Dep., pp. 77). However, Duffy testified that noone, including students, was allowed to download anything onto Seaford UFSD computers, (Duffy Dep., p. 18), and Derison testified that students were not allowed to download programs onto Seaford UFSD computers at all, although teachers and administrators "might have been able" to download, although not install, programs, (Derison Dep., pp. 65-66). Duffy also did not believe that students were permitted to upload anything onto Seaford UFSD computers. (Duffy Dep., p. 20). However, Derison testified that students were permitted to upload documents, including photographs, "sound files" and "video files", from "floppy disks and other media" into their documents folder on Seaford UFSD computers "within the bounds of [the Seaford UFSD's] computer policy," i.e., they had to be "educationally appropriate," but they were not permitted to load programs onto the computers. (Derison Dep., pp. 57-60). Derison further testified that it was possible that students could access their internet e-mail addresses from the Seaford UFSD's computers. (Derison Dep., p. 79).

B. Procedural History

On November 28, 2008, plaintiff commenced this action against defendants pursuant to, *inter alia*, 42 U.S.C. § 1983 and state law, alleging violations of her due process rights and New York Social Services Law §§ 413 and 420, negligence, failure to supervise, negligent infliction of emotional distress and battery, and seeking compensatory and punitive damages. On April 27, 2009, plaintiff filed an amended complaint against defendants pursuant to Section 1983, Title IX and state law, alleging, *inter alia*, violations of her due process rights (sixth cause of action), sexual harassment (seventh cause of action), negligence/gross negligence (second cause of action), failure to supervise (first cause of action), negligent infliction of emotional distress (third cause of action) and battery (fourth cause of action), and seeking compensatory and punitive damages in the total amount of thirty-five million dollars ($35,000,000.00), plus costs and attorney's fees.[4] Specifically, plaintiff alleges, *inter alia*, that defendants failed to immediately notify her parents of the alleged sexual abuse suffered by her on April 1, 2005 and of the subsequent harassment of her by other students at Seaford High School, and took no action to protect her from the subsequent verbal and emotional abuse about her sexual orientation and bullying that she suffered as a result of the incident. (Plaintiff's Responses to Defendants Interrogatories [Plf. Interr. Resp.], Nos. 5, 8 and 9).

By order dated March 25, 2010, the branches of defendants' motion pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure seeking dismissal of plaintiff's claims for punitive damages and pursuant to Title IX based upon the quality of the home-schooling provided her by defendants were granted and those claims were dismissed in their entirety, and defendants' motion

---

[4] The amended complaint does not contain a fifth cause of action.

was otherwise denied.

Defendants now move pursuant to Rule 56 of the Federal Rules of Civil Procedure for summary judgment dismissing the complaint.

## II. Discussion

### A. Standard of Review

Summary judgment should not be granted unless "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In ruling on a summary judgment motion, the district court must first "determine whether there is a genuine dispute as to a material fact, raising an issue for trial." McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 202 (2d Cir. 2007) (internal quotations and citations omitted); see Ricci v. DeStefano, 129 S.Ct. 2658, 2677, 174 L.Ed.2d 490 (2009) (holding that "[o]n a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party *only* if there is a 'genuine' dispute as to those facts." (Emphasis added) (internal quotations and citation omitted)). "A fact is material if it 'might affect the outcome of the suit under governing law.'" Spinelli v. City of New York, 579 F.3d 160, 166 (2d Cir. 2009) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Ricci, 129 S.Ct. at 2677 (quoting Matsushita Elec. Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

If the district court determines that there is a genuine dispute as to a material fact, the court

must then "resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment," Spinelli, 579 F.3d at 166 (internal quotations and citation omitted); see also Pucino v. Verizon Wireless Communications, Inc., 618 F.3d 112, 117 (2d Cir. 2010), to determine whether there is a genuine issue for trial. See Ricci, 129 S.Ct. at 2677. A genuine issue exists for summary judgment purposes "where the evidence is such that a reasonable jury could decide in the non-movant's favor." Beyer v. County of Nassau, 524 F.3d 160, 163 (2d Cir. 2008) (citing Guilbert v. Gardner, 480 F.3d 140, 145 (2d Cir. 2007)); see also United Transp. Union v. National R.R. Passenger Corp., 588 F.3d 805, 809 (2d Cir. 2009). "The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact," F.D.I.C. v. Great American Ins. Co., 607 F.3d 288, 292 (2d Cir. 2010) (quotations and citation omitted), after which the burden shifts to the nonmoving party to "come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." Id.; see also Spinelli, 579 F.3d at 166. Thus, the nonmoving party can only defeat summary judgment "by coming forward with evidence that would be sufficient, if all reasonable inferences were drawn in [its] favor, to establish the existence of" a factual question that must be resolved at trial. Spinelli, 579 F.3d at 166 (internal quotations and citations omitted); see also Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

B.     Title IX Sexual Harassment Claim[5]

Title IX provides, in relevant part, that with exceptions not relevant here, "[n]o person in

---

[5] Since Title IX does not authorize suits against school officials, teachers, and other individuals, see Fitzgerald v. Barnstable School Committee, 555 U.S. 246, 129 S.Ct. 788, 796, 172 L.Ed.2d 582 (2009), to the extent plaintiff asserts a Title IX claim against any of the individual defendants, those claims are dismissed with prejudice.

29

the United States shall, on the basis of sex, be excluded from participation in, be denied the benefit of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance * * *." 20 U.S.C. § 1681(a). "[S]exual harassment is a form of discrimination for Title IX purposes * * *." Davis Next Friend LaShonda D. v. Monroe County Board of Education, 526 U.S. 629, 641-43, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999). "[S]tudent-on-student sexual harassment, if sufficiently severe, can likewise rise to the level of discrimination actionable under [Title IX]." Davis, 526 U.S. at 650, 119 S.Ct. 1661. A recipient of federal education funds may be liable under Title IX: (1) for deliberate indifference to student-on-student sexual harassment; (2) of which "an official of the recipient entity with authority to take corrective action" has actual knowledge, Gebser v. Lago Vista Independent School District, 524 U.S. 274, 290, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998); and (3) "that is so severe, pervasive, and objectively offensive, and that so undermines and detracts from the victim['s] educational experience, that the victim-student[] [is] effectively denied equal access to an institution's resources and opportunities." Davis, 526 U.S. at 650-51, 119 S.Ct. 1661.

## 1.    Sexual Harassment

Sexual orientation is not a protected class under Title VII or, similarly, under Title IX[6]. See

---

[6] "Courts examine Title VII precedent when analyzing discrimination 'on the basis of sex' under Title IX." Pratt v. Indian River Cent. Sch. Dist., No. 7:09-CV-0411, 2011 WL 1204804, at * 11 n. 9 (N.D.N.Y. Mar. 29, 2011); see also Papelino v. Albany College of Pharmacy of Union University, 633 F.3d 81, 89 (2d Cir. 2011) ("[A] Title IX sex discrimination claim requires the same kind of proof required in a Title VII sex discrimination claim * * * [and] a Title IX hostile education environment claim is governed by traditional Title VII hostile environment jurisprudence." (internal quotations and citations omitted)); Torres v. Pisano, 116 F.3d 625, 630 n. 3 (2d Cir. 1997) ("Title VII principles apply in interpreting Title IX."); Folkes v. New York College of Osteopathic Medicine of New York Institute of Technology, 214

<u>Kiley v. American Society for Prevention of Cruelty to Animals</u>, 296 Fed. Appx. 107, 109 (2d Cir. Oct. 2, 2008) (summary order), <u>cert. denied</u>, 130 S.Ct. 379, 175 L.Ed.2d 236 (2009). Thus, harassment or discrimination based upon sexual orientation is not prohibited under either Title VII or Title IX. <u>Dawson v. Bumble & Bumble</u>, 398 F.3d 211, 217 (2d Cir. 2005); <u>Simonton v. Runyon</u>, 232 F.3d 33, 36 (2d Cir. 2000); <u>see also</u> <u>Swift v. Countrywide Home Loans, Inc.</u>, ___ F.Supp.2d ___, 2011 WL 924010, at * 3 (E.D.N.Y. Mar. 4, 2011) (holding that Title VII "provides no remedy for discrimination based upon sexual orientation.")

Plaintiff is alleging harassment and discrimination based upon a sexual incident between herself and another female. Specifically, plaintiff's claims are based upon students calling her such names as "lesbian" and "carpet-muncher," (Plf. Dep., pp. 120, 122; Lisa Dep., pp. 192, 250), and teasing her about the April 1, 2005 sexual encounter between herself and another female. Thus, plaintiff's sexual harassment claim is based upon her perceived lesbianism and/or bisexuality, not upon her gender.

Nor does plaintiff allege a gender stereotyping claim, <u>see</u>, <u>e.g.</u> <u>Kiley</u>, 296 Fed. Appx. at 109 ("[A] plaintiff may not use a gender stereotyping claim to bootstrap protection for sexual orientation into Title VII." (internal quotations and citation omitted)); i.e., that she was discriminated against because she "fail[ed] or refuse[d] to comply with socially accepted gender roles * * *." <u>Dawson</u>, 398 F.3d at 218; <u>see also</u> <u>Swift</u>, ___ F.Supp.2d ___, 2011 WL 924010, at * 3 (holding that gender stereotyping claims generally allege that the plaintiff was "subject[ed] to discrimination because his or her conduct fail[ed] to 'conform to gender norms.'" (quoting <u>Price</u>

F.Supp.2d 273, 281-82 (E.D.N.Y. 2002) (holding that "[i]n considering Title IX, courts have applied some (but not all [e.g., statutes of limitations, agency principles, notice principles, etc.]) of the legal principles of Title VII[,]" and applying the elements of a Title VII hostile work environment claim to a Title IX hostile educational environment claim).

Waterhouse v. Hopkins, 490 U.S. 228, 251-52, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (superceded by statute on other grounds)).

Accordingly, plaintiff cannot establish a Title IX sexual harassment claim as a matter of law. See, e.g. Dawson, 398 F.3d at 217-18 ("[T]o the extent that [the plaintiff] is alleging discrimination based upon her lesbianism, [she] cannot satisfy the first element of a prima facie cause under Title VII because the statute does not recognize homosexuals as a protected class."); Kiley, 296 Fed. Appx. at 109 (holding that the plaintiff could not bring a claim under Title VII for discrimination based on sexual orientation); Swift, ___ F.Supp.2d ___, 2011 WL 924010, at * 4 (dismissing plaintiff's gender stereotyping claims as an impermissible attempt to bootstrap a sexual orientation discrimination claim into a Title VII claim).

### 2. Actual Notice

In any event, the undisputed evidence in the record demonstrates that defendants did not have actual notice of any alleged sexual harassment of plaintiff by her peers. "For an educational facility to be liable [under Title IX], * * * the plaintiff must establish that a school official with 'authority to address the alleged discrimination and to institute corrective measures' had 'actual knowledge' of the discrimination and failed to adequately respond." Papelino v. Albany College of Pharmacy of Union University, 633 F.3d 81, 88-89 (2d Cir. 2011) (quoting Gebser, 524 U.S. at 290, 118 S.Ct. 1989). "Requiring actual, as opposed to constructive, knowledge [of the alleged sexual harassment] imposes a greater evidentiary burden on a Title IX claimant [than a Title VII claimant]." Hayut v. State University of New York, 352 F.3d 733, 750 (2d Cir. 2003); see also Abramova v. Albert Einstein College of Medicine of Yeshiva University, 278 Fed. Appx. 30, 31

(2d Cir. May 15, 2008).

Other than Sussman, who only saw the pictures of the April 1, 2005 incident on one (1) occasion when she accessed the website on which they were displayed from her office computer, (Sussman Dep., pp. 76-81), there is no evidence that any other defendant or employee of the Seaford UFSD had ever seen the pictures, accessed the website from the Seaford UFSD computers or learned that the pictures had been, or were being, displayed as "wallpaper" on Seaford UFSD computers. (See Sussman Dep., p. 94; Ragon Dep., pp. 107-108; Plf. Dep., pp. 135, 186; Conboy Dep., p. 93-96, 97, 99; Gemski Dep., pp. 9, 15, 21-22, 24, 27, 63; Lombardo Dep., pp. 38-39, 55; Burnhauser Dep., pp. 64-65; Derison Dep., pp. 82-83; Duffy Dep., pp. 21-24; Lisa Dep., pp. 243-245, 266; 56.1 Stat., ¶¶ 27). Plaintiff's allegation that the pictures of the April 1, 2005 incident had been downloaded or uploaded as "wallpaper" onto Seaford UFSD computers by a Seaford UFSD student or students, aside from being unsupported by anyone with personal knowledge thereof, is insufficient to demonstrate the existence of a genuine dispute of material fact with respect to the issue of whether any employee of the Seaford UFSD had actual knowledge that the pictures had been, or were being, displayed on any Seaford UFSD computer. See, e.g. Hayut, 352 F.3d at 750. Absent any evidence sufficient to establish that defendants had actual knowledge of any such harassment, they cannot be liable under Title IX for their alleged deliberate indifference in responding to it.

Moreover, other than plaintiff informing Sussman that a "few" unidentified students had called her a lesbian or other name she found to be derogatory on the same morning that Sussman first learned of the April 1, 2005 incident and spoke with her, (Sussman Dep., pp. 54-56, 101-102), plaintiff has proffered no evidence that any defendant or employee of the Seaford UFSD had actual

33

knowledge of any pervasive harassment of plaintiff by her peers following the April 1, 2005 incident. Indeed, plaintiff herself testified that she did not speak with Sussman again following that first interview, (Plf. Dep., pp. 123-124, 127, 155), even though the harassment became more severe following that interview, (Plf. Dep., pp. 155-156, 159-161), or tell any other adult at the Seaford UFSD about the alleged harassment, (Plf. Dep., pp. 128-129, 156-157, 160, 175-176, 192-193, 222-223). Plaintiff's allegation that some of her teachers offered to assist her "if [she] needed somebody to talk to or if [she] was upset," (Plf. Dep., p. 223), which offers she did not accept, (Plf. Dep., p. 223), is insufficient to demonstrate the existence of a genuine dispute of material fact with respect to the issue of whether any employee of the Seaford UFSD had actual knowledge of any pervasive harassment of plaintiff by her peers. Absent any evidence sufficient to establish that defendants had actual knowledge of any such harassment, they cannot be liable under Title IX for their alleged deliberate indifference in responding to it.

Plaintiff's argument that "[t]he nature and pervasiveness of [the] harassment of [her] may be evidence from which actual notice could be inferred," in essence, asks this Court to find that defendants had constructive notice of the harassment, which is insufficient to establish liability under Title IX.[7] The case Tesoriero v. Syosset Central School District, 382 F.Supp.2d 387 (E.D.N.Y. 2005), cited by plaintiff in purported support of her contention, is inapposite. That case involved a claim of a sexual assault of a student by a teacher of which the defendants had received prior, albeit unsubstantiated, complaints. Specifically, there was evidence that the school

---

[7] Indeed, plaintiff elsewhere indicates that "given the circumstances – including the fact of the assault, [plaintiff's] youth, and the continued harassment on and off school campus – a jury could conclude that the Defendants *should have known*, even absent a specific complaint from [plaintiff] or her parents, that this was a particularly risky situation necessitating [their] attention." (Plf. Opp., p. 13) (emphasis added).

psychologist, assistant principal, a science teacher and the principal of the defendant school district had received prior complaints of the teacher's conduct towards the plaintiff-student. The district court held that "[c]learly, the institution must have actual knowledge of at least some incidents of harassment in order for liability to attach" and "at minimum, must have possessed enough knowledge of the harassment that it reasonably could have responded with remedial measures to address the kind of harassment upon which plaintiff's legal claim is based." Id. at 397 (quoting Crandell v. New York College of Osteopathic Medicine, 87 F.Supp.2d 304, 320 (S.D.N.Y. 2000)). The district court further held that "[a]t some point * * * a supervisory school official knows, or it should be obvious to him or her, that a school employee is a substantial risk to sexually abuse children." Id. (quoting Gordon ex rel. Gordon v. Ottumwa Community School District, 115 F.Supp.2d 1077, 1083 (S.D. Iowa 2000)).[8]

Clearly, Tesoriero is factually distinguishable from the instant case. Here, plaintiff claims student-on-student harassment consisting of mere name-calling and teasing, of which there is no evidence that defendants had actual notice except for Sussman's knowledge of a few instances of name-calling by unidentified students. See, e.g. Patterson v. Hudson Area Schools, No. 05-74439,

---

[8] Similarly, the case Doe v. School Administrative District No. 19, 66 F.Supp.2d 57 (D. Me. 1999), upon which the Tesoriero court relied, involved a claim of sexual abuse of a student by a teacher. In that case, there was evidence that a substitute teacher had previously informed a school official that the teacher was having a sexual relationship with at least one other male student. In other words, courts have found "actual knowledge" where the defendants knew about the alleged harasser's conduct towards others "which indicates some degree of risk that the harasser would subject the plaintiff to similar treatment." Bloomer v. Becker College, No. 09-11342-FDS, 2010 WL 3221969, at * 4 (D. Mass. Aug. 13, 2010) (citing cases). Such cases are obviously irrelevant to this case, where there is no evidence that defendants even knew the identities of any of the alleged harassers, no less that they engaged in similar harassment of other students and, therefore, that there was a risk that plaintiff would be subjected to similar harassment.

35

2010 WL 455386, at * 5 (E.D. Mich. Feb. 3, 2010) ("In a case involving alleged student-on-student sexual harassment, a school district may not be liable under Title IX absent evidence that it ignored known acts of student-on-student sexual harassment. * * * The knowledge element may be satisfied when an appropriate official has actual knowledge of a substantial risk of abuse to students based on prior complaints by other students. * * * [O]nly conduct which has been brought to the attention of an appropriate Defendant official would be relevant * * *." (quotations and citation omitted)). Moreover, the record is bereft of any evidence that any defendant or other employee of the Seaford UFSD had actual knowledge of similar harassment towards other students thereby indicating some degree of risk that plaintiff would be subjected to similar conduct.

The only evidence of defendants' actual notice of any alleged harassment of plaintiff by her peers pertains to their knowledge that the pictures of the April 1, 2005 were being displayed on a website on the internet.[9] Since defendants did not have actual notice of any other alleged harassment of plaintiff by her peers, i.e., that the pictures of the April 1, 2005 incident were being displayed on the Seaford UFSD computers or that plaintiff was being subjected to pervasive harassment by her peers, plaintiff cannot establish a Title IX claim against the Seaford UFSD based upon that conduct as a matter of law.

3.      Deliberate Indifference

"Deliberate indifference makes sense as a theory of direct liability under Title IX only where the funding recipient has some control over the alleged harassment. A recipient cannot be

_____

[9] Plaintiff admits that defendants did not have actual notice of the April 1, 2005 sexual assault until after it had occurred and, thus, cannot be liable for the sexual assault itself. (Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment [Plf. Opp.], p. 9).

directly liable for its indifference where it lacks the authority to take remedial action." Davis, 526 U.S. at 644, 119 S.Ct. 1661. In Davis, the Supreme Court held that:

> "[Title IX's] plain language confines the scope of prohibited conduct based on the recipient's degree of control over the harasser and the environment in which the harassment occurs. If a funding recipient does not engage in harassment directly, it may not be liable for damages unless its deliberate indifference subject[s] its students to harassment. That is, the deliberate indifference must, at a minimum, cause [students] to undergo harassment or make them liable or vulnerable to it. * * * Moreover, * * * the harassment must take place in a context subject to the school district's control * * *."

526 U.S. at 644-45, 119 S.Ct. 1661 (alterations in original, internal quotations and citations omitted). Accordingly, the liability of a recipient of federal funds is limited "to circumstances wherein [it] exercises substantial control over both the harasser and the context in which the known harassment occurs." Davis, 526 U.S. at 645, 119 S.Ct. 1661; see also T.Z. v. City of New York, 634 F.Supp.2d 263, 268 (E.D.N.Y. 2009) ("A plaintiff seeking recovery for a violation of Title IX based on student-on-student harassment must prove that the alleged harassment took place in a location within the control of a recipient of federal funds.") "Where * * * the misconduct occurs during school hours and on school grounds * * * the recipient retains substantial control over the context in which the harassment occurs * * * [and] exercises significant control over the harasser." Davis, 526 U.S. at 646, 119 S.Ct. 1661. Accordingly, "recipients of federal funding may be liable for 'subject[ing]' their students to discrimination where the recipient is deliberately indifferent to known acts of student-on-student sexual harassment and the harasser is under the school's disciplinary authority." Davis, 526 U.S. at 646-47, 119 S.Ct. 1661.

Moreover, recipients of federal funding will only be deemed "deliberately indifferent" to known acts of student-on-student harassment where its "response to the harassment or lack thereof

is clearly unreasonable in light of the known circumstances," Davis, 526 U.S. at 648, 119 S.Ct. 1661, or "when remedial action only follows after a lengthy and unjustified delay." Hayut, 352 F.3d at 751 (internal quotations and citation omitted). Accordingly, a recipient of federal funding is only required to "respond to known peer harassment in a manner that is not clearly unreasonable." Davis 526 U.S. at 648-49, 119 S.Ct. 1661. "Deliberate indifference * * * requires something more than a proffer indicating the ultimate inadequacy of preventative and curative measures. Instead, the measures taken must be so inadequate that a degree of discriminatory intent may be inferred- allowing the trier of fact to conclude that Defendants intended for the discrimination to occur." Yap v. Oceanside Union Free School District, 303 F.Supp.2d 284, 295 (E.D.N.Y. 2004). "In an appropriate case, there is no reason why courts, on a motion * * * for summary judgment * * * could not identify a response as not 'clearly unreasonable' as a matter of law." Davis, 526 U.S. at 649, 119 S.Ct. 1661; see also D.T. v. Somers Central School District, 348 Fed. Appx. 697, 700 (2d Cir. Oct. 15, 2009); Back v. Hastings on Hudson Union Free School District, 365 F.3d 107, 127 (2d Cir. 2004).

"Furthermore, the deliberate indifference must subject a student to harassment, 'that is, the indifference must, at a minimum, cause students to undergo harassment or make them liable to or vulnerable to it.'" DT v. Somers Central School District, 348 Fed. Appx. 697, 700 (2d Cir. Oct. 15, 2009) (summary order) (quoting Davis, 526 U.S. at 645, 119 S.Ct. 1661).

The uncontroverted evidence establishes that defendants responded both expeditiously and reasonably upon being notified of an alleged sexual assault of one of its students, even though the alleged assault occurred off of school grounds, during non-school hours, by an individual who was not a student of the Seaford UFSD. Sussman promptly notified Ragon and interviewed plaintiff on

the same date that she learned of the April 1, 2005 incident and pictures; on that same date, Sussman and Ragon interviewed the one (1) student of Seaford UFSD identified to them as having knowledge of the incident; Sussman contacted Massapequa High School within one (1) hour of learning that one of its students had knowledge of the incident and successfully arranged to have the pictures removed from the website, the only place she knew that the pictures were being displayed; Ragon reported the incident and pictures to Conboy and Duffy and sought guidance on how to proceed; and Ragon had Derison investigate the Seaford UFSD computers to ensure that the website had not been accessed, and could not be accessed, from those computers. (Sussman Dep., pp. 46, 49-52, 54-56, 59-62, 67-76, 79-80, 82, 153; Ragon Dep., pp. 37-38, 43-45, 47-51, 53-54, 57-58; Conboy Dep., pp. 39-40, 42, 93-96, 99, 116; 56.1 Stat., ¶¶ 12, 19, 20, 22, 24; Plf. Dep., p. 121; Lisa Dep., pp. 232; Duffy Dep., pp. 21-24, 29-31, 36, 46-47; Derison Dep., pp. 12-13, 79-83, 85). Accordingly, defendants' response to the April 1, 2005 incident and to the existence of the pictures on the internet, the only alleged harassment of which they had actual notice, was not clearly unreasonable as a matter of law. See, e.g. Yap, 303 F.Supp.2d at 294-95 (finding that although the evidence revealed that the plaintiff had suffered through "an extremely unpleasant experience," i.e., a "significant amount" of name-calling and physical abuse, the defendants' actions upon learning of the harassment, including informally talking with the accused, revoking privileges of the accused and suspending the accused from use of school buses, was not unreasonable as a matter of law).

Plaintiff's contention that defendants acted with deliberate indifference by failing to take any disciplinary action against the students harassing her does not demonstrate the existence of a triable issue of fact because it ignores the absence of any evidence in the record indicating that

defendants ever learned of the identity of any student alleged to be harassing plaintiff. Similarly, plaintiff's contention that defendants acted with deliberate indifference by failing "to fully inquire regarding which of their students who [sic] had information about the incident and pictures," does not demonstrate the existence of a triable issue of fact because it ignores the fact that with the exception of Travato, with whom Sussman and Ragon spoke, plaintiff never identified any student to defendants as having any knowledge of the April 1, 2005 incident and pictures. Moreover, absent any knowledge that any student of the Seaford UFSD was harassing plaintiff because of the April 1, 2005 incident or pictures, and since defendants were successful in having the pictures promptly removed from the website, the only place of which they knew the pictures were being displayed, defendants had no reason to inquire further about who had any information about the incident or pictures. To the extent plaintiff is suggesting that defendants could only have acted reasonably by inquiring of each student in the Seaford UFSD about whether he or she had knowledge of the April 1, 2005 sexual assault or pictures, such conduct on the part of defendants would have been unfeasible, unnecessary and unsound. Indeed, such conduct on the part of defendants would have further disseminated the information about the April 1, 2005 incident and pictures; information that plaintiff herself did not want imparted to anyone, including the police and her own parents.

Further, defendants' purported failure to immediately alert plaintiff's parents or "the authorities" to the existence of pictures of plaintiff on the internet does not establish a triable issue of fact because, *inter alia*, such failures did not subject plaintiff to harassment, or make her more vulnerable to it. Indeed, plaintiff continued to be harassed even after her mother and the police were aware of the sexual assault and pictures. (Plf. Dep., pp. 160-161, 186-187).

Since defendants' response to the harassment of which they had actual notice was not clearly unreasonable as a matter of law, plaintiff cannot establish that defendants were deliberately indifferent to the harassment. Accordingly, plaintiff cannot establish a Title IX claim against defendants as a matter of law.

4.      Severity of Harassment

Moreover, the Supreme Court has held that:

> "in the school setting, students often engage in insults, banter, teasing, shoving, pushing, and gender-specific conduct that is upsetting to the students subjected to it. Damages are not available for simple acts of teasing and name-calling among school children, however, even where th[o]se comments target differences in gender. Rather, in the context of student-on-student harassment, damages are available only where the behavior is so severe, pervasive, and objectively offensive that it denies its victims the equal access to education that Title IX is designed to protect."

Davis, 526 U.S. at 651-52, 119 S.Ct. 1661. Accordingly, it is not enough to establish that "a student has been teased * * * or called . . . offensive names." Id. (internal quotations and citations omitted). "Physically threatening or humiliating conduct is more likely than offensive utterances to rise to the level of discrimination." T.Z., 634 F.Supp.2d at 270 (internal quotations, alterations and citation omitted).

Although the Supreme Court further stated that "[a]lthough, in theory, a single instance of sufficiently severe one-on-one peer harassment could be said to have [a systemic] effect [of denying the victim equal access to an educational program or activity], [it] [thought] it unlikely that Congress would have thought such behavior sufficient to rise to [that] level in light of the inevitability of student misconduct and the amount of litigation that would be invited by entertaining claims of official indifference to a single instance of one-on-one peer harassment,"

Davis, 526 U.S. at 653, 119 S.Ct. 1661, several district courts have found that a single instance of a "sufficiently serious * * * sexual assault" occurring on school property could be considered pervasive for purposes of Title IX. T.Z., 634 F.Supp.2d at 270-71 (citing cases).

Construed in a light most favorable to plaintiff, the record establishes that plaintiff was the victim of one (1) instance of sexual assault by a female who was not a student of the Seaford UFSD occurring off school grounds during hours that the school was closed. Although such conduct may be objectively offensive and severe, and rise to the level of pervasiveness required under Title IX, Seaford UFSD did not, *inter alia*, have control over either the alleged assailant or the context in which the conduct occurred. Accordingly, plaintiff cannot base any Title IX claim against the Seaford UFSD on the April 1, 2005 incident itself.[10]

To the extent plaintiff seeks to base her Title IX claim on the subsequent harassment of her by other unidentified students of Seaford High School during the two (2) weeks she remained in school following the April 1, 2005 incident, even assuming, *arguendo*, that defendants had actual notice of such harassment, the alleged harassment consisted merely of insults, name-calling and pushing which, though upsetting to plaintiff, is not sufficiently severe or offensive as to be actionable under Title IX. See, e.g. Davis, 526 U.S. at 651-52, 119 S.Ct. 1661.

Kelly v. Yale University, No. 3:01-CV-1591, 2003 WL 1563424 (D. Conn. Mar. 26, 2003), an unreported case cited by plaintiff in support of her position that the alleged harassment was sufficiently severe and pervasive, is distinguishable. In that case, plaintiff's Title IX claims were

---

[10] Plaintiff even admits that "Defendants [can] not be liable for the sexual assault of [plaintiff] * * *." (Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment [Plf. Opp.], p. 6). Plaintiff also admits that any subsequent harassment occurring off of school grounds is not actionable. (Plf. Opp., pp. 8, 9). Plaintiff has cited to no law in support of her "proxy-harassment" argument, which I find to be without merit.

42

premised upon her rapist's continued presence at the university and her fear of subsequent encounters with him. The district court held that "further encounters, of any sort, between a rape victim and her attacker could create an environment sufficiently hostile to deprive the victim of access to educational opportunities provided by a university." Id. at * 3. In this case, however, the female involved in the April 1, 2005 incident with plaintiff was not a student at Seaford High School and there is no claim that plaintiff feared encountering her on Seaford UFSD property. Rather, plaintiff only feared encountering further teasing and name-calling by her fellow students, which is insufficient to establish a viable Title IX claim as a matter of law.

For all of the aforementioned reasons, the branch of defendants' motion seeking summary judgment dismissing plaintiff's Title IX claim is granted and that claim is dismissed in its entirety with prejudice.

C.    Section 1983 Due Process Claim[11]

Plaintiff alleges that the Fourteenth Amendment Due Process Clause required defendants to "provide reasonable safety and care of students in their control and custody," (Amended Compl., ¶¶ 94-95), which they failed to do. (Id., ¶ 101). Specifically, plaintiff alleges that defendants: (1) "failed to properly discipline their students that were involved in the April 1, 2005 sexual assault and molestation;" (2) failed to contact the police upon learning of the April 1, 2005 incident and have plaintiff's assailants "arrested for the sexual assault and molestation of [plaintiff]"; (3) "failed to address, rectify, investigate the attack, violent assault and/or harassment against Plaintiff;" (4) failed to properly supervise their students; and (5) failed to properly train their teachers and staff

---

[11] Unlike plaintiff's Title IX claim, plaintiff's Section 1983 claims may be asserted against both individuals and municipal entities. See Fitzgerald, 555 U.S. 246, 129 S.Ct. at 796.

"as to methods of supervision," thereby providing the opportunity for students to post the pictures on the Seaford UFSD's computers and to harass plaintiff. (Amended Compl., ¶¶ 96-97, 102-103, 105).

Although plaintiff may have a cognizable property interest in a free and appropriate public education ("FAPE")[12], in order to state a Section 1983 procedural due process claim, she must demonstrate that she "was deprived in some manner of [that] property interest in a FAPE by Defendants' conduct." Smith v. Guilford Board of Education, 226 Fed. Appx. 58, 63 (2d Cir. June 14, 2007) (summary order).

### 1. Monell Claim

A municipality or municipal entity, such as the Seaford UFSD, see, e.g. Valenti v. Massapequa Union Free School District, No. 09-CV-977, 2010 WL 475203, at * 7 (E.D.N.Y. Feb. 5, 2010) (holding that school districts "are subject to similar liability as local governments under Monell"), cannot be held liable under Section 1983 on a *respondeat superior* theory. See Monell v. Department of Social Services of City of New York, 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); see also Connick v. Thompson, 131 S.Ct. 1350, 1359 (Mar. 29, 2011) (5-4 decision) (holding that under Section 1983, governmental bodies are not vicariously liable for their employees' actions); Los Angeles County, California v. Humphries, 131 S.Ct. 447, 452, 178 L.Ed.2d 460 (2010) ("[A] municipality cannot be held liable solely for the acts of others, e.g., *solely* because it employs a tortfeasor." (emphasis in original) (quotations and citation omitted)).

---

[12] Plaintiff alleges Fourteenth Amendment constitutional rights in having "equal access to the education system," (Amended Compl., ¶¶ 91, 102), and "an education free from harassment, ridicule, embarrassment and hostility," (id., ¶¶ 92, 102).

To prevail on a Section 1983 claim against a municipal entity, a plaintiff must show: "(1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury." Roe v. City of Waterbury, 542 F.3d 31, 36 (2d Cir. 2008), cert. denied, 130 S.Ct. 95, 175 L.Ed.2d 234 (2009); see also Connick, 131 S.Ct. at 1359 ("Plaintiffs who seek to impose liability on local governments under Section 1983 must prove that 'action pursuant to official municipal policy' caused their injury." (quoting Monell, 436 U.S. at 691, 98 S.Ct. 2018)); Humphries, 131 S.Ct. at 452 ("[A] municipality may be held liable when execution of a government's *policy or custom* . . . inflicts the injury." (emphasis in original) (quotations and citation omitted)); Fitzgerald, 555 U.S. 246, 129 S.Ct. at 797 (holding that a plaintiff may state a Section 1983 claim against a school district or other municipal entity only by showing "that the harassment was the result of municipal custom, policy, or practice.")

"A school district's liability under Monell may be premised on any of three theories: (1) that a district employee was acting pursuant to an expressly adopted official policy; (2) that a district employee was acting pursuant to a longstanding practice or custom; or (3) that a district employee was acting as a 'final policymaker.'" Hurdle v. Board of Education of City of New York, 113 Fed. Appx. 423, 424-25 (2d Cir. Oct. 27, 2004) (summary order) (quoting Lytle v. Carl, 382 F.3d 978, 982 (9th Cir. 2004)); see also Connick, 131 S.Ct. at 1359 ("Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law.")

In addition, "[i]n limited circumstances, a [municipal entity's] decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an

official government policy for purposes of Section 1983." Connick, 131 S.Ct. at 1359; see also Bliss v. Putnam Valley Central School District, No. 7:06-cv-15509, 2011 WL 1079944, at * 8 (S.D.N.Y. Mar. 24, 2011) ("A school district may be held liable for inadequate training, supervision or hiring where the failure to train, hire or supervise amounts to deliberate indifference to the rights of those with whom municipal employees will come into contact."); Valenti, 2010 WL 475203, at * 7 ("A policy, custom, or practice of the municipal entity may be inferred where 'the municipality so failed to train its employees as to display a deliberate indifference to the constitutional rights of those within its jurisdiction.'") "To satisfy [Section 1983], a municipality's failure to train its employees in a relevant respect must amount to deliberate indifference to the rights of persons with whom the untrained employees come into contact." Connick, 131 S.Ct. at 1359 (internal quotations, alterations and citation omitted). "[A] plaintiff must demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the alleged injury." Roe, 542 F.3d at 37 (quoting Board of County Commissioners of Bryan County, Okl. v. Brown, 520 U.S. 397, 404, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997)). "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." Connick, 131 S.Ct. at 1359. "A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." Id. at 1360.[13]

---

[13] Although the Supreme Court recognized "a narrow range of * * * hypothesized single-incident liability" based upon "an obvious need for some form of training," Connick, 131 S.Ct. at 1361, this case does not fall within that narrow and "rare" range of cases, particularly because the Seaford UFSD had a specific policy regarding use of its computers and there is no evidence of a complete lack of training of Seaford UFSD personnel regarding supervision of students. In other words, the record does not establish that Seaford UFSD personnel had an "utter lack of an ability to cope with constitutional situations" arising from the supervision of students that existed in the hypothesized single-incident case. Connick, 131 S.Ct. at 1363.

a.     Failure to Train

Plaintiff's Section 1983 Monell claim is based on a failure-to-train "deliberate indifference" theory. (Amended Compl., ¶¶ 98-99, 103-104). Under that theory, plaintiff bears the burden of establishing: (1) that a final policymaker for the Seaford UFSD was deliberately indifferent to the need to train teachers and staff about their obligation to supervise students; and (2) that the lack of training actually caused the alleged due process violation, i.e., the deprivation of plaintiff's right to a FAPE. See, e.g. Connick, 131 S.Ct. at 1358. "'Deliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." Id. at 1360.

The record is bereft of any evidence that a final policymaker of the Seaford UFSD had notice that the pictures of the April 1, 2005 incident were allegedly being displayed on any Seaford UFSD computer. In fact, the record establishes that upon learning of the existence of the pictures on the internet, employees of the Seaford UFSD immediately took steps both to have the pictures removed from the website and to ascertain that the website had not been, and could not be, accessed from school computers. Moreover, plaintiff has not established that the Seaford UFSD had notice that its training of its employees with respect to their supervision of students' use of school computers was deficient in any way, nor that the Seaford UFSD had a "policy of inaction" in light of any such notice. See, e.g. Connick, 131 S.Ct. at 1359, 1366.

Similarly, plaintiff has not established that the Seaford UFSD had notice that its training of its employees with respect to their general supervision of students was deficient in any way, or that there had been a pattern of similar constitutional violations by Seaford UFSD employees. "Without notice that a course of training is deficient in a particular respect, decisionmakers can

47

hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." Connick, 131 S.Ct. at 1360. Indeed, as previously indicated, the record establishes that far from being deliberately indifferent to the situation, Seaford UFSD personnel acted expeditiously and reasonably in responding to what it knew, i.e., that plaintiff had been involved in a sexual act with a female who was not a student of the Seaford UFSD occurring off of school grounds during non-school hours, and that pictures of such act had been posted on the internet by an individual or individuals who also were not students of the Seaford UFSD.

Since plaintiff has not demonstrated that the Seaford UFSD was deliberately indifferent to a need for more or different training of its employees with respect to their supervision of students, plaintiff's Section 1983 Monell claim against the Seaford UFSD and Seaford High School, and her Section 1983 claims against the individual defendants in their official capacity, must be dismissed as a matter of law.

b. Seaford UFSD's Confidentiality Policy

Although not expressly alleged in her amended complaint, in her opposition to defendants' motion for summary judgment, plaintiff bases her Monell claim against the Seaford UFSD on its policy of student confidentiality, i.e., "that student confidentiality could not be breached absent a communication that involves abuse, a criminal act or information that a student was going to harm themselves." (Plf. Opp., pp. 13-14). According to plaintiff, notwithstanding that policy, Sussman, who "was apprised that Plaintiff was sexually assaulted, that pictures were taken during the incident and that [plaintiff] was a threat to herself," (Plf. Opp., p. 14), ascertained that plaintiff was "fine" and failed to report to assault and pictures to plaintiff's parents, (id.) Accordingly,

48

plaintiff's argument is not that defendants acted pursuant to an official discriminatory policy adopted by the Seaford UFSD. Rather, plaintiff's argument is, in essence, that Sussman failed to act in accordance with Seaford UFSD's express policy providing for exceptions to its student confidentiality policy for situations of abuse, criminal acts (disseminating and/or possessing alleged child pornography) and threats of harm. Thus, plaintiff is actually seeking to impose vicarious liability upon the Seaford UFSD for the acts of Sussman in allegedly violating its confidentiality policy, in direct violation of Monell.

In any event, the record does not establish that defendants' decision to not immediately inform plaintiff's parents of the April 1, 2005 incident and pictures based upon Seaford UFSD's confidentiality policy caused the alleged harassment of plaintiff by her peers. Indeed, it is clear from the record that the harassment continued even after plaintiff's mother learned of the incident. (Plf. Dep., pp. 160-161, 186-187). Accordingly, summary judgment dismissing plaintiff's Section 1983 Monell claim based upon the Seaford UFSD's confidentiality policy is appropriate.

     2.     Claims against the Individual Defendants in their Individual Capacity[14]

To succeed on a Section 1983 claim of gender discrimination or sexual harassment in the school environment of a student by other children or their parents, "a plaintiff must show deliberate indifference on the part of the defendants themselves." Gant ex rel. Gant v. Wallingford Board of Education, 195 F.3d 134, 140 (2d Cir. 1999).[15] "[I]n cases of alleged student-on-student

_____

[14] There is no dispute, for purposes of this motion, that the individual defendants were acting under color of state law at all relevant times.

[15] Although Gant involved a claim of racial discrimination in violation of the Fourteenth Amendment and Section 1981, the analysis is the same in all relevant respects to plaintiff's claim of sexual harassment. Indeed, the Gant court relied upon cases involving claims of student-on-

harassment, only deliberate indifference to such harassment can be viewed as discrimination by school officials themselves." Id. In Gant, the Second Circuit noted that the Supreme Court's reasoning in Davis with respect to deliberate indifference was equally applicable to claims of discrimination under the Fourteenth Amendment. 195 F.3d at 140 n. 5. Thus, defendants can only be found to have acted with deliberate indifference if their "response to known discrimination 'is clearly unreasonable in light of the known circumstances.'" Id. at 141 (quoting Davis, 119 S.Ct. at 1674); see also Back, 365 F.3d at 127.

Since, *inter alia*, as previously indicated, defendants' response to the April 1, 2005 incident and subsequent harassment of plaintiff by her peers, including the existence of the pictures on the internet, was not clearly unreasonable in light of the circumstances known to them, plaintiff cannot establish that defendants caused her to be deprived of her Fourteenth Amendment rights as a matter of law. See, e.g. Bliss, 2011 WL 1079944, at * 8. Even assuming, *arguendo*, that it may have been more prudent for defendants to have notified the police and/or plaintiffs' parents immediately upon learning of the alleged harassment, "[t]he relevant inquiry * * * does not depend on whether one can plausibly 'second guess[] the * * * decisions made by school administrators." Gant, 195 F.3d at 145 (quoting Davis, 119 S.Ct. at 1674).[16] Accordingly, plaintiff cannot establish a Section 1983 claim against the individual defendants in their individual capacity as a matter of law.

---

student sexual harassment. Id. at 140 (citing Murrell v. School District No. 1, 186 F.3d 1238, 1249-51 (10th Cir. 1999) and Davis, 526 U.S. 629, 119 S.Ct. 1661).

[16] Notably, the alleged harassment of plaintiff did not stop even after her mother learned of the April 1, 2005 incident, pictures and harassment and reported it to the police. Thus, defendants' failure to inform plaintiff's parents or the police of the incident, pictures and harassment cannot be said to have caused the deprivation of plaintiff's Fourteenth Amendment rights as a matter of law.

a.   Qualified Immunity

Even assuming, *arguendo*, that plaintiff has adequately alleged a deprivation of her Fourteenth Amendment rights, the individual defendants are nonetheless protected from liability in their individual capacity under Section 1983 by the doctrine of qualified immunity. "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); see also Ashcroft v. al-Kidd, ___ S.Ct. ___, 2011 WL 2119110, at * 4 (May 31, 2011) ("Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional rights, and (2) that the right was 'clearly established' at the time of the challenged conduct."). The scope of qualified immunity is broad, and it protects "'all but the plainly incompetent or those who knowingly violate the law.'" al-Kidd, ___ S.Ct. ___, 2011 WL 2119110, at * 9 (quoting Malley v. Briggs, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)).

"A government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." al-Kidd, ___ S.Ct. ___, 2011 WL 2119110, at * 7 (internal quotations, alterations and citation omitted). "[E]xisting precedent must have placed the statutory of constitutional question beyond debate." Id. Even assuming, *arguendo*, that defendants violated plaintiff's Fourteenth Amendment right to a FAPE free from discrimination and sexual harassment, that right was not clearly established at the time of their challenged conduct, i.e., it was objectively reasonable for defendants to believe at all relevant times

51

that their conduct did not violate that right since, *inter alia*, they took immediate and appropriate steps to address and rectify the harassment of which they were aware.

To the extent that defendants' failure to apprise plaintiff's parents and/or the police of the April 1, 2005 incident and existence of the pictures deprived plaintiff of her right to a FAPE, "the doctrine of qualified immunity recognizes that 'reasonable mistakes can be made as to the legal constraints on particular . . . conduct.'" Bliss, 2011 WL 1079944, at * 9 (quoting Saucier v. Katz, 533 U.S. 194, 205, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)); see also al-Kidd, ___ S.Ct. ___, 2011 2119110, at * 9 ("Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions.") So long as the official's mistake as to what the law requires is reasonable, qualified immunity shields him or her from liability. Bliss, 2011 WL 1079944, at * 9. However, if, viewed objectively, it is obvious that "no reasonably competent official" would have taken the challenged action, qualified immunity does not apply. Id. "Summary judgment is appropriate when a trier of fact would find that reasonable officials could disagree." Id. (citing Lennon v. Miller, 66 F.3d 416, 421 (2d Cir. 1995)). At a minimum, reasonable officials could disagree as to whether defendants' responses to the April 1, 2005 incident and existence of the pictures was appropriate, particularly in light of the Seaford UFSD's policy implementing state policies regarding student confidentiality. Accordingly, the doctrine of qualified immunity shields defendants from plaintiff's Section 1983 claims against them in their individual capacity.

D.    State Law Claims[17]

---

[17] Plaintiff asserts state law claims for failure to supervise (first cause of action); negligence (second cause of action); negligent infliction of emotional distress (third cause of

"In federal court, state notice-of-claim statutes apply to state-law claims." <u>Parise v. New York City Department of Sanitation</u>, 306 Fed. Appx. 695, 697 (2d Cir. Jan. 16, 2009) (summary order) (citing <u>Felder v. Casey</u>, 487 U.S. 131, 151, 108 S.Ct. 2302, 101 L.Ed.2d 123 (1988)); <u>see also</u> <u>Hardy v. New York City Health & Hospitals Corp.</u>, 164 F.3d 789, 793 (2d Cir. 1999). New York Education Law § 3813 provides, in relevant part, as follows:

> 1. No action or special proceeding, for any cause whatever, * * * shall be prosecuted or maintained against any school district * * * or any officer of a school district * * * unless it shall appear by and as an allegation in the complaint or necessary moving papers that a written verified claim upon which such action or special proceeding is founded was presented to the governing body of said district * * * within three months after the accrual of such claim * * *.

> 2. Notwithstanding anything to the contrary hereinbefore contained in this section, no action or special proceeding founded upon tort shall be prosecuted or maintained against any of the parties named in this section or against any teacher or member of the supervisory or administrative staff or employee where the alleged tort was committed by such teacher or member or employee acting in the discharge of his duties within the scope of his employment * * * unless a notice of claim shall have been made and served in compliance with section fifty-e of the general municipal law. Every such action shall be commenced pursuant to the provisions of section fifty-i of the general municipal law.

Accordingly, presentment of a written verified claim to the governing body of a school district within three (3) months of the accrual of a claim is a condition precedent to commencement of any action under New York State law against that school district. N.Y. Educ. Law § 3813(1); <u>see</u> <u>Bucalo v. East Hampton Union Free School District</u>, 351 F.Supp.2d 33, 34-35 (E.D.N.Y. 2005). However, "[t]ort claims against a school district [and its teachers, staff members and employees] are excepted from [Section 3813(1)'s] notice requirements, and must [instead] comply with the notice requirements found in [New York] General Municipal Law § 50-e." <u>Amorosi v.</u>

---

action); and battery (fourth cause of action). Accordingly, all of plaintiff's state law claims sound in tort.

<u>South Colonie Independent Central School District</u>, 9 N.Y.3d 367, 370, 849 N.Y.S.2d 485, 880 N.E.2d 6 (2007). New York General Municipal Law § 50-e, in effect until September 18, 2010, provided, in relevant part, as follows:

> 1. * * * (a) In any case founded upon tort where a notice of claim is required by law as a condition precedent to the commencement of an action or special proceeding against a public corporation * * *, or any officer, appointee or employee thereof, the notice of claim shall comply with and be served in accordance with the provisions of this section within ninety days after the claim arises * * *.

Accordingly, under New York Education Law Section 3813(2) and New York General Municipal Law Section 50-e(1), plaintiff was required to file a notice of claim with respect to her state law claims against defendants within ninety (90) days of the accrual of those claims as "a condition precedent to bringing a personal injury action against [defendants]." <u>Parise</u>, 306 Fed. Appx. at 697; <u>see also</u> <u>Hardy</u>, 164 F.3d at 793; <u>Brown v. City of New York</u>, 95 N.Y.2d 389, 392, 718 N.Y.S.2d 4, 740 N.E.2d 1078 (2000) ("To enable authorities to investigate, collect evidence and evaluate the merit of a claim, persons seeking to recover in tort against a municipality are required, as a precondition to suit, to serve a Notice of Claim.")

In addition, New York General Municipal Law § 50-i, in effect until September 15, 2009, provided, in relevant part:

> "1. No action or special proceeding shall be prosecuted or maintained against a * * * school district for personal injury * * * alleged to have been sustained by reason of the negligence or wrongful act of such * * * school district or of any officer, agent or employee thereof, * * * unless, (a) a notice of claim shall have been made and served upon the * * * school district in compliance with section fifty-e of this chapter, (b) it shall appear by and as an allegation in the complaint or moving papers that at least thirty days have elapsed since the service of such notice and that adjustment or payment thereof has been neglected or refused, and (c) the action or special proceeding shall be commenced within one year and ninety days after the happening of the event upon which the claim is based; * * *."

Notice of claim requirements are strictly construed by New York state courts and a failure to comply with those requirements ordinarily requires dismissal of the state law claims. Hardy, 164 F.3d at 793-94.

1.    Sufficiency of Notice of Claim

New York General Municipal Law § 50-e(2) requires that a notice of claim "be in writing, sworn to by or on behalf of the claimant and * * * set forth: (1) the name and post-office address of each claimant, and of his attorney, if any; (2) the nature of the claim; (3) the time when, the place where and the manner in which the claim arose; and (4) the * * * injuries claimed to have been sustained so far as then practicable * * *." See Parise, 306 Fed. Appx. 695 (2d Cir. 2009); Parochial Bus System, Inc. v. Bd. of Ed. of City of New York, 60 N.Y.2d 539, 470 N.Y.S.2d 564 (1983). Section 50-e(2) "does not require those things to be stated with literal nicety or exactness." Brown, 95 N.Y.2d at 393, 718 N.Y.S.2d 4 (internal quotations and citation omitted). Rather, "[t]he test of the sufficiency of a Notice of Claim is merely 'whether it includes information sufficient to enable the [school district] to investigate [the claim]." Brown, 95 N.Y.2d at 393, 718 N.Y.S.2d 4 (quoting O'Brien v. City of Syracuse, 54 N.Y.2d 353, 358, 445 N.Y.S.2d 687, 429 N.E.2d 1158 (1981)). "Thus, in determining compliance with the requirements of General Municipal Law § 50-e, courts should focus on the purpose served by a Notice of Claim: whether based on the claimant's description municipal authorities can locate the place, fix the time and understand the nature of the [incident]." Id.

Plaintiff's notice of claim: (1) designates plaintiff and her parents as the claimants and provides their post-office address; (2) designates Seaford High School and Massapequa High

School as "the state agency or agencies that * * * caused [them] damage;" and (3) indicates only that claimants "have been seriously injured as a result of negligence and reckless conduct." (Schroeder Aff., Ex. B). Clearly, the notice of claim is facially deficient insofar as, *inter alia*, it does not indicate "the time when, the place where and the manner in which the claim arose," nor provide any description of the acts or omission upon which plaintiff was basing her claim of "negligence and reckless conduct," or how such acts or omissions caused any injury to her, so as to allow defendants to understand the nature of her claim against them. Contrary to plaintiff's contention, the notice of claim did not merely "omit[] *some* information regarding the incident," (Plf. Opp., p. 24) (emphasis added), it omitted any information regarding the incident.


### 2. Amendment of Notice of Claim

New York General Municipal Law § 50-e(5) allows for a discretionary extensions of time within which a claimant must serve a notice of claim, provided the extension "does not exceed the time limited for the commencement of" an action by the claimant against the school district. However, all applications under New York General Municipal Law Section 50-e, including applications for leave to file a late notice of claim, must be made to the New York State supreme court or county court. N.Y. Gen. Mun. Law § 50-e(7). Accordingly, this Court is without jurisdiction to extend plaintiff's time within which to file a notice of claim under state law.

Nonetheless, New York General Municipal Law Section 50-e(6) provides that "[a]t any time after the service of a notice of claim and at any stage of an action or special proceeding to which the provisions of this section are applicable, a mistake, omission, irregularity or defect made in good faith in the notice of claim required to be served by this section, not pertaining to the

56

manner or time of service thereof, may be corrected, supplied or disregarded, as the case may be, in the discretion of the court, *provided it shall appear that the other party was not prejudiced thereby*." N.Y. Gen. Mun. Law § 50-e(6) (emphasis added). Section 50-e(6) "merely permits correction of good faith, non-prejudicial, technical mistakes, defects or omissions, not substantive changes in the theory of liability." Mahase v. Manhattan & Bronx Surface Transit Operating Auth., 3 A.D.3d 410, 771 N.Y.S.2d 99, 101 (1st Dep't 2004); see also Parise, 306 Fed. Appx. at 698 (accord).

Even assuming, without deciding, that this Court would have jurisdiction under Section 50-e(6) to disregard the deficiencies in plaintiff's notice of claim, or permit her to amend her notice of claim to correct the deficiencies therein, see, e.g. Parise, 306 Fed. Appx. at 697 n. 2 (finding no error in the district court's conclusion that even if it had jurisdiction to correct or disregard a defective notice of claim under Section 50-e (6), it would deny the plaintiffs' request on the merits), plaintiff's characterization of her notice of claim as merely defective, and her concession that "certain facts were inadvertently omitted" therefrom, (Plf. Opp., p. 24), is an understatement. In fact, plaintiff's notice of claim is a model of insufficiency. Even if plaintiff sought to amend her notice of claim, which she has not, any such amendment would not be a mere correction of a mistake, omission or defect, but a complete rewriting of the notice of claim in its entirety.[18]

Even assuming, *arguendo*, that plaintiff had not been represented by counsel at the time the notice of claim was served, (Defendants' Reply, Ex. 1), her argument that the lack of legal representation should excuse the deficiencies in her notice of claim is disingenuous because, *inter*

---

[18]The "notice of claim" is of questionable validity in any event as it was apparently notarized one (1) day after plaintiff Lisa Tyrrell claims to have served it. (See defendant's Reply Affidavit, Ex. 1).

*alia*, her subsequently-retained counsel never sought leave to amend the notice of claim to cure the obvious deficiencies therein.

In any event, Section 50-e(6) only permits a court to disregard, or allow correction of, deficiencies in a notice of claim if there would be no prejudice to the defendant as a result. See N.Y. Gen. Mun. Law § 50-e(6). Contrary to plaintiff's contention, defendants have established that they were prejudiced by plaintiff's wholly deficient notice of claim. Although defendants had notice of a sexual encounter involving plaintiff and another female who was not a student of the Seaford UFSD occurring off of school grounds during non-school hours, and of pictures of that encounter being displayed on a private photo-sharing website on the internet, plaintiff concedes that the alleged physical and emotional trauma caused by the sexual assault and posting of the pictures on the internet cannot establish a basis for liability against defendants. There is no evidence that defendants had notice of any pervasive harassment of plaintiff by her peers at Seaford High School or of the pictures being displayed as "wallpaper" on the Seaford UFSD computers. Even the letter dated April 26, 2005, sent by plaintiff's parents to Ragon requesting home instruction for plaintiff indicated only that pictures of the alleged sexual assault had been "posted * * * on the internet;" that Sussman "knew about [the] sexual assault and the posting of pictures on the internet;" that "postings of the pictures of the assault were exhibited in the computer classes * * *;" and that "the students who * * * posted their crimes on the Internet [were] assigned to [plaintiff's] class on a daily basis." (Mesidor Decl., Ex. C). There is no reference in that letter to any harassment of plaintiff by other students of Seaford High School, nor that the pictures of plaintiff had been uploaded by any student as "wallpaper" on Seaford UFSD computers.

Since defendants' notice of the existence of the pictures was limited to their display on a

private photo-sharing website, their investigation was likewise limited to whether any student of the Seaford UFSD had posted the pictures on the internet and whether the pictures had been accessed by students on, or were accessible from, Seaford UFSD computers. There was no basis for any investigation of plaintiff's subsequently alleged and totally unsupported claim that the pictures had been uploaded to, and displayed as "wallpaper" on, Seaford UFSD computers by students. Likewise, there was no basis for defendants to investigate plaintiff's now-asserted claims of pervasive harassment of her by her peers at Seaford High School. Accordingly, the notice of claim filed on behalf of plaintiff in this action was per se prejudicial to defendants based upon its lack of factual specificity.

For all of the foregoing reasons, summary judgment dismissing plaintiff's state claims in their entirety is appropriate.[19]

III.    Conclusion

For the reasons stated herein, defendants' motion for summary judgment is granted and the amended complaint is dismissed in its entirety with prejudice. The Clerk of the Court is directed to enter judgment in favor of defendants and against plaintiff and to close this case.

SO ORDERED.

/S/

SANDRA J. FEUERSTEIN
United States District Judge

Dated: June 1, 2011
       Central Islip, N.Y.

_____

[19] In light of this determination, it is unnecessary to address defendants' remaining contentions seeking dismissal of plaintiff's state law claims on the merits.